WALLER v. UNITED STATES.

No. 12232.

United States Court of Appeals
Ninth Circuit.

Sept. 19, 1949.

John Gavin, Walter J. Robinson, Jr., Yakima, Wash., James P. Salvini Sunnyside Wash., for appellant.

Harvey Erickson, U. S. Atty., Frank R. Freeman, Asst. U. S. Atty., Spokane, Wash., for appellee.

Before STEPHENS, HEALY, and POPE, Circuit Judges.

STEPHENS, Circuit Judge.

Appellant Waller was tried and convicted in the district court by a judge and jury on an indictment charging violation of Section 15(c) of the Commodity Credit Corporation Charter Act, Public Law 806, 80th Congress, 62 Stat. 1070, 15 U.S.C.A. § 714m(c).[1] Section 15(c) of the Act provides: "Whoever shall willfully steal, conceal, remove, dispose of, or convert to his own use or to that of another any property owned or held by, or mortgaged or pledged to, the Corporation, shall, upon conviction thereof, be punished by a fine of not more that $10,000 or by imprisonment for not more than five years, or both."

Appellant claims: (1) That the court erred in denying his motions for judgment of acquittal because (a) there was no substantial evidence that the property taken by appellant was owned by the Commodity Credit Corporation and (b) there was no substantial evidence of appellant's intent to steal from the Commodity Credit Corporation, or from anyone else, and (2) that the court erred in denying a motion for a new trial on the ground of the admission into evidence of a document which was not connected with the offense charged and which was highly prejudicial to appellant.

Appellant is president of the Herrett Trucking Company (a corporation) which has its principal office in the town of Sunnyside, Washington, and owns a farm

1. The Commodity Credit Corporation prior to its reincorporation in 1948 by Act of Congress was a state-chartered wholly federally owned corporation which for more than 13 years among other things had been the agency through which the federal government's price-support commitments to farmers were carried out. Its rechartering was occasioned by Section 304(b) of the Government Corporation Control Act, 59 Stat. 602, 31 U.S.C. A. § 869 (b).

nearby on which he keeps livestock. The company does general inter and intra-state hauling of agricultural commodities as well as other supplies and equipment and is predominantly a family affair, appellant's two brothers also being officers thereof.

Williamson is a farmer owning property adjacent to Waller's farm and among other things produces potatoes and has livestock. Williamson has from time to time participated in the various federal Irish potato-price-support programs administered by the Commodity Credit Corporation. A considerable portion of his 1948 crop was sold to the government and in payment he received the going or market price (over $2 per cwt.). On August 19, 1948, Williamson contracted with the Corporation to purchase 11,000 cwt. of fresh Irish potatoes for livestock feed at 10¢ per cwt. and paid the government $1,100.[2] The contract of sale by reference to a form which was entitled "Terms and Conditions for Sale of Fresh Irish Potatoes for Livestock Feed" expressly provided:[3]

"Use: Purchaser agrees to use the potatoes delivered pursuant to his order for the sole purpose of feeding such potatoes to livestock. *Title to the potatoes shall not pass to the purchaser until the potatoes delivered are acually fed to livestock or processed into feed for livestock.*" [Emphasis added.] There is testimony, however, in the record to the effect that Williamson did not read this provision.

On August 22, 1948, Williamson elicited the aid of Waller's trucks to haul purchased potatoes from the warehouse to Williamson's feed lot. There is evidence of close friendship between the two and of frequent favors done for one another.[4] Williamson had tried to induce Waller to feed potatoes to his livestock and on the occasion to which the criminal charge relates authorized Waller to take some of the potatoes purchased from the Corporation for such purpose. On the day following such authorization, Waller sent a flat-bed truck to the warehouse and 320 sacks (16 ton) of potatoes were loaded which were

2. The Act of April 12, 1945, 7 U.S.C.A. § 1381 note, permitted the Commodity Credit Corporation to sell surplus potatoes for feed to Williamson at a price less than parity.

3. The contract of sale was composed of an "Announcement of Sale of Fresh Irish Potatoes for Livestock Feed" which stated: "* * * Potatoes for livestock feed will be sold subject to the terms and conditions set forth in Form FV-111 * * *", and an "Order (To be filled in and signed by prospective purchaser)" in which the purchaser warranted "that the potatoes will be used only for feeding livestock" and acknowledged immediately above his signature that he had "read the terms and conditions of this sale as set forth herein and in Form 111, 'Terms and Conditions for Sale of Fresh Irish Potatoes for Livestock Feed' and agree fully to abide by such terms and conditions." The first paragraph of Form FV-111 is quoted in the text above.
  Section 4(g) of the Commodity Credit Corporation Charter Act, 15 U.S.C.A. § 714b(g), grants to the Corporation the essential power to enter into and carry out such contracts or agreements as are necessary or desirable for the conduct of its business.

4. The following is quoted from the record: "Q. What is the basis for your acquaintance? What transactions have you had back and forth?
  * * * * * * *
  "A. [Williamson] He borrows my equipment, and we exchange equipment back and forth; I get his trucks, and he gets my tractors, and then I get tires from him at wholesale, and I sell him hay, and he helps me haul, and I help him haul, and I've got a big tarpaulin of his now, and anything I've got he's always welcome to it, because I know he'll make it right. I go and get stuff from him.
  * * * * * * *
  "Q. What kind of transactions have you been engaged in together? A. [Waller] We have—I've purchased quite a few things to support my cattle arrangement with him, in the matter of hay, grain; I've used his trucks and tractors: he has various small trucks and tractors, and we have the larger things, tarps back and forth, a hay fork, small things and large, and we've traded cattle, I've purchased some from him, he's purchased some from me.
  "Q. Do you have any borrowing transactions? A. [Waller] Oh, yes, indeed. * * * I can take from him what I want to, even though he might not be there, and he takes from me what he needs * * *."

174

released for delivery to Williamson on account of his purchase from the Corporation. The mode of loading, as if for long distance hauling, engaged the attention of a horticulture inspector, and surveillance of the following activities ensued.

The flat-bed truck was driven to Waller's place of business and remained parked there for most of the evening of August 23, 1948. At about 8:00 P.M., Williamson called Waller to have the latter pick up one of Williamson's small farm trucks at the warehouse which had been loaded with some more of the purchased potatoes and which Williamson was unable to move but wanted available for the next morning's farm activities and definitely told Waller he could have them and to dump them at Waller's feed lot. Waller agreed and in fact dumped that truckload at his place. While doing so, he observed the quality of the potatoes and at that moment admittedly formed the intent to take some of the 16 tons of potatoes on the other truck and sell them for human consumption.[5] Waller returned to his place of business and had the flat-bed truck, followed by a closed van, driven to Williamson's feed lot where appellant observed that a large quantity of potatoes was on the ground. Waller thereupon resacked some 100 sacks of the potatoes from the original sacking to unmarked bags and placed them in the closed van. The remainder of the flat-bed truckload was dumped, and the closed van was driven back and parked overnight in the trucking company's area. The resacking transpired between 11:00 P.M. and 3:00 A.M. in the morning. The next day more potatoes were obtained for Williamson by a Waller truck, part of which were dumped at Williamson's farm and the rest (some 220 sacks) were resacked at Waller's place of business and placed in the closed van. That evening the loaded van was driven to Portland, Oregon, where on August 25, 1948, the load (323 sacks) was sold to a produce dealer for $2.10 per cwt.

Since the potato containers were not marked, the Portland produce dealer required that they be tagged and graded. They were accordingly tagged "U. S. No. 1, Hathaway F., Granger, Wn." A check for $678.30 given in payment for the load was made payable to Hathaway Farms. Waller's brother-in-law owns Hathaway Farms, on which potatoes are grown and in which Waller has a financial interest. Waller cashed the check with the alleged consent of his brother-in-law and pocketed the proceeds.

On August 25, 1948, Waller through a brother contracted to purchase 4,100 cwt. of surplus potatoes from the Corporation. A contract similar in detail to that which Williamson signed was executed.

Three independent investigations of Waller's activities were made, and horticulture inspectors, a special agent of the Department of Agriculture, and an agent of the Federal Bureau of Investigation testified as to the findings. Waller admitted to the investigators and at the trial that he did all of the things outlined above.

We turn our attention to appellant's claim that the potatoes with which we are here concerned were not the property of the Commodity Credit Corporation.

As this point is argued by appellant, we think it is a false issue. As between the Corporation and Williamson there was no misunderstanding. Williamson knew that he was receiving the potatoes at a mere nominal price in consonance with the government price support program and that they were not to be released to the market but were to be made useful by being fed to livestock. His interest in the potatoes was definitely so limited. He could not legally release them to Waller except under such limitation. Waller, by his surreptitious acts, justified the conclusion that he knew he had no title to the potatoes and had no right to them except as a drayman to haul them at Williamson's

5. Waller testified as follows:
"Q. What did you decide, then, at that time? A. The thing that I first made up my mind on was I should take these already washed, clean potatoes, and sell them, and if I needed more potatoes for stock, then the Hathaway potatoes were in the picture; I would at least save the difference in the sorting."

direction and permission as to their disposal and use. Notwithstanding such knowledge he disregarded both the direction and the permission given him and sold them as his own potatoes into the market. It is an unsustainable strain on credulity to try to view the whole situation as though Waller was unaware of the government's program and why and how Williamson, a grower and seller of potatoes himself, was having potatoes in large quantities to haul from an exchange warehouse. However this may be, the facts of the case fit exactly into the terms of the statute under which the charge against Waller was laid.[6] The evidence practically demonstrates that the accused wilfully did "* * * steal, conceal, remove, dispose of," and "convert to his own use * * *" the potatoes in question from *someone*. It turns out that the "someone" was both the Commodity Credit Corporation and Williamson. The latter had the right of possession of the potatoes by the consent of the Commodity Credit Corporation for a limited purpose which, of itself, presupposes a type of ownership in the corporation and that the potatoes were "held by" the Corporation. In arriving at the above conclusion, the idea of intent is necessarily included.

■ We hold that the undisputed facts of the case carry with them convincing evidence of an intent to do the things which constitute the crime charged. That the wrongdoer, conscious of his wrong, entertains a mistaken idea as to the ownership of property he appropriates does not dissipate the criminality of his conduct. Haugen v. United States, 9 Cir., 1946, 153 F.2d 850. The kernel of the crime is the knowledge that the act was wrongful, and we have seen that Waller knew his act was wrong. Although he claims it as such, it is no defense that he acted upon the assumption that he was misappropriating property belonging to his friend. He at least knew

that Williamson did not have the right to put the potatoes into the market for human food or to pass them to another to do so and knowing this limitation on Williamson's right to the potatoes assumed the risk the act of doing so entailed. Under the contract signed by Williamson the title to the potatoes was in the Corporation when they were appropriated by Waller for use which negatives the intent of the government to stabilize prices. When Waller used them contrary to the use for which they were granted to him and contrary to a use which he knew was interdicted by his government, he is in a poor position indeed to plead vindication because his benefactor Williamson had not read the title reservation when the potatoes were delivered to him.

Finally, it is contended that the admission in evidence of the August 25th contract executed on behalf of appellant by his brother, whereby the purchase of surplus potatoes from the Corporation was arranged, was prejudicial error for which the district court should have granted appellant's motion for a new trial.

■ Under familiar principles, relevant evidence of other offenses or acts, if similar and not too remote, may be admissible on the issue of fraudulent intent if such intent is a constituent and disputed element of the crime with which the accused is charged. Tedesco v. United States, 9 Cir., 1941, 118 F.2d 737; Lawrence v. United States, 9 Cir., 1947, 162 F.2d 156; Nye & Nissen v. United States, 9 Cir., 1948, 168 F.2d 846; McCoy v. United States, 9 Cir., 1948, 169 F.2d 776, certiorari denied 335 U.S. 898, 69 S.Ct. 298.

It is pointed out that the transaction of which the admitted contract is evidence occurred subsequent in time to the acts which base the present charge, and the claim is made that this time relation renders the evidence in question irrelevant and inad-

---

6. Senate Report No. 1032 to accompany S. 1322, 80th Congress, 2nd Session, 2 U. S. Code Congressional Service, 1948, p. 2138, at p. 2154, says of Section 15(c) of the Charter Act: "* * * [It] prescribes the punishment for the offenses of stealing, larceny, conversion, and related crimes. The section will be operative with respect to all property owned or held by, or mortgaged or pledged to, the Corporation, *whether in the possession of the Corporation or not.*" [Emphasis added.]

missible, citing Witters v. United States, 1939, 70 App.D.C. 316, 106 F.2d 837, 125 A.L.R. 1031. Where other acts are offered as evidentiary of intent under the rule heretofore mentioned, it matters not whether they are subsequent or prior in time. Regina v. May, 1845, 1 Cox Cr. 236; Shreve v. United States, 9 Cir., 1939, 103 F.2d 796. Proof of knowledge, on the other hand, materially differs requiring inherently that the other acts be prior in time. Witters v. United States, supra, illustrates the distinction; there, under a charge of receiving stolen property, proof that the accused subsequently received property known by him to be stolen was held not to permit an inference that he had knowledge of the stolen character of the property with which he was charged as receiving. See, in general, 2 Wigmore, 3d Ed., 1940, § 300 et seq., p. 192. We conclude that the August 25th contract was properly received in evidence on the issue of appellant's intent at the time of the acts charged in the indictment.

Affirmed.