H. C. SEALS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 15107.

United States Court of Appeals, Eighth Circuit.

April 5, 1955.

Boyd Tackett, Texarkana, Ark., and W. S. Atkins, Hope, Ark. (Bobby Steel, Nashville, Ark., Ben Shaver, and Paul Jones, Texarkana, Ark., were with them on the brief), for appellant.

Henry M. Britt, Asst. U. S. Atty., Fort Smith, Ark. (Charles W. Atkinson, U. S. Atty., Fayetteville, Ark., and Robert E. Johnson, Asst. U. S. Atty., Greenwood, Ark., were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and COLLET and VAN OOSTERHOUT, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

This is an appeal by defendant Seals from judgment and conviction under the following indictment:

"On or about March 3, 1952, in the Western District of Arkansas, Opal Henrietta Simmington, an agent, officer, and employee of the Bank of Dierks, Dierks, Arkansas, the deposits of which were at the time insured by the Federal Deposit Insurance Corporation, and H. C. Seals, a customer of said bank, did embezzle, abstract, purloin, and wilfully misapply the sum of $4,356.80, for which amount the said H. C. Seals drew a check upon his account in said bank, and presented the said check for payment to the said bank, and the said Opal Henrietta Simmington, as such officer, agent, and employee did pay the said check, the said H. C. Seals not having on deposit in said bank at the time funds with which to pay said check."

Mrs. Simmington was also convicted and served notice of appeal but her appeal

has been dismissed upon her own application.

Defendant Seals urges a number of errors which he claims entitle him to a reversal. His first contention is that the court erred in overruling his motion for judgment of acquittal made at the close of the Government's evidence and renewed at the close of all of the evidence, based on the ground that there was no testimony whatsoever from which a reasonable inference could be drawn that Seals had any willful intention to defraud the bank or to aid or abet Mrs. Simmington to defraud the bank.

■ The uncontroverted evidence establishes that Seals on March 3, 1952, cashed a check on the bank of Dierks for $4,356.80 and received the proceeds thereof in cash. It is stipulated that the Bank of Dierks is an insured bank. The indictment is based on Title 18, United States Code, section 656.[1] This statute is a revision of section 592, Title 12, United States Code, 1940 Edition. The legislative history of the present act is fully reviewed in United States v. Klock, D.C.N.D.N.Y., 100 F.Supp. 230, 233, reversed on other grounds, 2 Cir., 210 F.2d 217, where the conclusion is reached that no substantial change in the prior statute was intended. The court quotes with approval the Reviser's Note reading, " 'The revised section without changing in any way the meaning or substance of existing law, clarifies, condenses, and combines related provisions largely rewritten in matters of style.' " The former act expressly made intention to injure or defraud the bank an element of the offense. Under the present act the fraudulent intent remains a necessary element of the crime. In this case the trial court in its instructions correctly told the jury that in order to convict they must find that Seals intended to injure or defraud the bank.

■ The honoring of a check which creates an overdraft is not necessarily a violation of 18 U.S.C. § 656. In reversing for excluding evidence bearing on intent, the court, in United States v. Klock, 2 Cir., 210 F.2d 217, 221, said:

"* * * In effect, the defense to the substantive counts of misapplication of funds was that the bank officials treated the overdrafts as loans. While perhaps making of loans in this manner may be in violation of some state law, nevertheless it does not constitute a crime under 12 U.S.C.A. § 592 or 18 U.S.C. § 656, if Klock had no notice of the impropriety. * * * "

In United States v. Matot, 2 Cir., 146 F.2d 197, at page 198, the court in discussing a situation somewhat similar to the one involved in the present case states:

" * * * The situation was curious. Matot was a man, engaged in a business, apparently prosperous; he had ample means to meet his indebtedness to the bank; and he must have known that at some time and in some way he would be called to meet his overdrafts. It is hard to believe that he could have really intended to defraud the bank, particularly because, if he did, he was bound to fail. Indeed, Holmes's own defalcations were also curious; it remains totally inexplicable why he should have accommodated his friends without any

1. "Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."

ascertainable profit to himself and at great risk. For these reasons any evidence of Matot's good faith was highly important. * * *"

In Dow v. United States, 8 Cir., 82 F. 904, at page 908, this court said:

" * * * Of course, frauds and criminal misapplications of bank funds by the officials thereof may be committed by the recognition or payment of checks drawn on the bank when there are not funds to meet the same; but the criminal wrong, including the intent, must appear from all the facts surrounding the transaction, and cannot be inferred, as a matter of law, from the mere fact that when the check was drawn there were not funds on deposit to meet the check * * *."

In 7 Am.Jur., Banks, § 609, p. 442, it is stated:

"According to the general view the payment of an overdraft by a bank amounts to a loan to the depositor; for that reason the amount thereof may be recovered from the depositor."

See also 9 C.J.S., Banks and Banking, § 353(b), page 703.

From the foregoing it is apparent that in order to convict in this case the Government must go further than to show that the cashing of the defendant's check resulted in an overdraft. It must in addition show that Seals had an intent to injure or defraud the bank, or to aid or abet Mrs. Simmington in so doing. The crucial question on this appeal is whether the record contains evidence which will support a finding that Seals intended to injure or defraud the bank. To answer this question it is necessary that the evidence be examined in some detail.

Seals was a small merchant and farmer and had been a customer of the Bank of Dierks for many years. The ledger of his account since 1939 is in evidence. During most of this period he maintained a substantial balance. No serious question is raised as to the accuracy of the account prior to 1950. The active officers and employees of the bank were Tom Westbrook, Vice-President and Cashier, and Mrs. Simmington, Assistant Cashier and Bookkeeper. Westbrook owned 85 per cent of the stock. The bank in recent years has not sent out statements supported by cancelled checks to its customers regularly. The only evidence as to this is that offered by Seals and Mrs. Simmington. The latter's testimony is that Mr. Westbrook directed her not to send out statements, and that there had been many complaints about this practice from the customers.

When Seals was told in 1951 that his balance was a few hundred dollars, he expressed dissatisfaction with the amount and made numerous efforts to get his statements and cancelled checks and to have his balance corrected. He eventually received from the bank statements covering at least most of the period from April 1950 to September 1951 (Exhibits 17–22) with supporting checks. Exhibit 22 contains the statement, "I found your statement for May 1950." Exhibit 14, an undated letter from the bank to Seals, states:

"I'm sending you some more of your checks.

"Mr. Seals I found you have another sheet that has a balance of $2050.00 on it."

Seals was told that he had been given all the statements and checks that the bank had. At the trial the Government produced from the bank's records Exhibit 28, customer's statement covering the period from January to April 1950, showing withdrawals of $3,995, but without supporting checks. The fact that this customer's statement was found in the bank with perforated margins unremoved would at least raise an inference that such statement and supporting checks had never been sent to Seals. After a number of conferences at the bank with Mrs. Simmington, Seals at her suggestion mailed her a list of his 1950–1951 deposits. These were verified by the bank and one deposit of $499.80 Seals had omitted was added.

Seals arrived at what he claimed he had on deposit before the issuance of the $4,356.80 check as follows:

| | |
|---|---|
| January 30, 1950, Balance | $3,037.30 |
| 1950–1951 deposits evidenced by duplicate slips and verified by bank | 5,074.95 |
| Total credit | $8,112.25 |
| 1950–1951 checks returned to him by bank as shown on statements returned to him | 3,743.78 |
| Balance | $4,368.47 |

This statement was shown by Seals to Mrs. Simmington, who, after a number of conferences and some checking, agreed that the balance was right.

There is no real dispute as to the January 1950 balance of $3,037.30. The examiner took a little different starting point. Seals said that this figure was given him by the bank, and Exhibit 3, Bank Deposit Ledger, shows this exact balance on January 17, 1950. The above deposit figure of $5,074.95 is also undisputed. These deposits were verified and approved by the bank examiner. The variance in dispute arises on the item of the checks issued since January 1950. The examiner contends that the total checks drawn during the involved period amounted to $7,193.44 as shown by Exhibit 47. His total was arrived at by adding all checks listed on the bank's ledger sheet since January 1950. The addition of the check figures on said ledger sheet is apparently accurate. Seals contends that the only statements he received for the period after January 1950 are Exhibits 17–22, and that he received only the checks covered by these statements. Some of the figures on said exhibits are hard to read, but his addition seems to be substantially correct. Mr. Cannady, a Government witness, was the Federal Deposit Insurance Corporation examiner who first investigated the affairs of the Bank of Dierks. On his first visit to Mr. Seals, Seals turned over to him all statements that he had received from the bank and his checks. Seals fully explained his difficulty in getting his statements and the method by which he computed his balance. He permitted the examiner to go over his papers and to search for any additional items. There is no evidence that Seals ever received any additional statements or any cancelled checks above his $3,743.78 computation. The difference between the examiner's computation and Seals' computation is $3,449.66. Seals in his computation did make a mistake in including in his list of deposits a January 10, 1950, deposit of $1,004.20 which had already been included in his January starting balance of $3,037.30. There is nothing to indicate any fraudulent intent as to this item. It was listed in his claim submitted to both the bank and the bank examiner for inspection, and any kind of a check of the account would have revealed the mistake.

Exhibit 16, Seals' customer's statement, shows a balance in November 1951 of $4,356.80 and the withdrawal of that amount on March 3, 1952, by the check involved in this controversy. At the time of the withdrawal, Mr. Westbrook, the principal officer and stockholder, was present and approved the payment of the check, in fact he went to the vault himself to get the money and made the payment. Several months elapsed between the time Seals' amount of deposit was agreed upon and the time of its withdrawal. The occasion for the withdrawal was the prospective purchase of land from a named party moving out of the State, who wanted payment in cash. Later, the land deal fell through, and Seals deposited the money in another bank in the county, one-half to his credit and one-half to his wife's. The Government feels that the deposit of the money in another bank has a bearing on the fraud issue. We do not agree. The difficulty Seals had in obtaining statements from the bank was reason enough why a new banking connection might be desirable. The defendant at all times freely told the Govern-

ment witnesses where and how the money was deposited.

The bank examiner could find no record of the $4,356.80 withdrawal on the bank's ledger or on any of its other records. Neither could he find any ledger record of the supposed balance of $243.07 in the Cohen Seals account, nor could any record be found of the balance of $2,050 mentioned in Exhibit 14, above, nor of the supposed balance of $1,300 in a Seals and Chambers joint account.

When Mr. Cannady left the bank in January 1953, the shortage was $175,000, which represents an extremely large proportion of the bank's deposits which amounted to $425,000. There is very little in the record to indicate the manner in which the shortage occurred.

The Government witnesses, who were bank examiners and F.B.I. agents, all testified that Seals was at all times cooperative, that he gave them all the papers and information they asked for, that he explained to each of them his trouble getting the bank statements and cancelled checks and the manner in which he computed his bank balance. He also told them where he had redeposited the money. He never changed his statement that he had the money in the bank. Mr. Scurlock testified in part:

"On the next interview, I told him he didn't have that much but only $4.00 and some cents. He said he thought he did have it. When I told him he had some money that didn't belong to him, he said, 'If that's the case, I got some money that don't belong to me, then I will pay it back.' He did so.

"On my last interview, I don't recall anything of material importance. We were still a little undecided about the case. We wanted to know if he had knowledge of any other similar transactions."

Mr. Cannady testified:

"What launched me on the Seals investigation was that on August 13, 1952, I found the memorandum signed 'Opal', which is in evidence as Exh. 14. Mr. Seals was cooperative with me. He gave me the statements and the sheet pinned to the back. He said 'Certainly, you can have them.' He gave me the bank statement that shows a balance in November, 1951, of $4356.60. It shows a check for $4356.80 under posting date of March 3, 1952. I did not make an itemized list of what Seals turned over to me. Did not have time. When I was at Mr. Seals' home, I did not know there might be a criminal prosecution."

 There is no direct evidence of any intention on the part of Seals to injure or defraud the bank. Proof of such intent may, of course, be established by circumstantial evidence. The only evidence that we can discover that would bear on the issue of Seals' intent to defraud is the fact that his figures as to his deposit balance did not agree with the balance the examiner arrived at from the bank records. We have quoted some excerpts from the testimony of the Government officials. We have read the record of their testimony closely, and fail to find anything therein to show that they had any feeling that Seals was withholding anything from them, or that they did not believe that he was sincere and honest in making his claims.

The record discloses a number of discrepancies in the bank record, some of which have been pointed out. The bank had last been examined by the Federal Deposit Insurance Corporation on April 9, 1952. It is extremely likely that many false entries upon the bank's books were necessary to avoid the detection of the substantial shortage.

There is nothing in the testimony of Seals or Mrs. Simmington that adds any strength to the Government's case on the intent to defraud issue. Their testimony indicates many complaints of Seals about his balance and prolonged negotiations by Seals to get the bank to correct his account. For that purpose he brought in his deposit slips and checks, and Mrs. Simmington's testimony is that

she was finally convinced that he was right.

While perhaps not controlling, we note that the Government witnesses testified that they could find no evidence that Mrs. Simmington received any part of the money which Seals withdrew. There is no evidence showing any close relationship between Seals and Mrs. Simmington or providing any apparent reason why Mrs. Simmington should subject herself to criminal liability to enable Seals to obtain money.

[5, 6] There is no direct evidence as to Seals' financial responsibility, except that the evidence shows that he was able to and did produce the money to meet the check promptly upon demand. It is true that if a crime has been committed restitution does not wipe out the crime. However, financial responsibility and repayment are material considerations on the issue of intention to defraud. United States v. Wicoff, 7 Cir., 187 F.2d 886; United States v. Klock, supra; United States v. Matot, supra.

This case was submitted to the jury at 10:03 A.M. on March 18. They reported to the court several times that they were unable to agree. At 2:40 P. M. the following day the court gave the jury the hung jury instruction approved by this court in Wright v. United States, 8 Cir., 175 F.2d 384. The jury returned guilty verdicts at 3:18 P.M. that day.

 The general rules as to the matters to be considered in passing on motions for acquittal appear to be well established. After verdicts of guilty, in reviewing orders overruling motions for acquittal, the appellate court is required to view the evidence in the light most favorable to the Government, and must give the Government the benefit of all inferences that may reasonably be drawn from the evidence. Appellate courts do not weigh the evidence or determine the credibility of witnesses. Egan v. United States, 8 Cir., 137 F.2d 369; Miller v. United States, 8 Cir., 138 F.2d 258; Jensen v. United States, 8 Cir., 213 F.2d 781. In United States

v. Socony-Vacuum Oil Co., Inc., 310 U. S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, the Court holds that the motion for acquittal requires an examination of the record, not for the purpose of weighing the evidence, but only to ascertain whether there was some competent and substantial evidence before the jury fairly tending to sustain the verdict. In United States v. Gasomiser Corp., D.C., 7 F.R. D. 712, 718, the court states:

"This then being a criminal case based upon circumstantial evidence, in order for the motions of the defendants to be denied guilt must be the only reasonable hypothesis from such evidence. If there is any other reasonable hypothesis, although admittedly guilt may also be a reasonable hypothesis, then the defendants are entitled to judgments of acquittal. In this circuit, it is clear that 'In order to justify a conviction of crime on circumstantial evidence it is necessary that the directly proven circumstances be such as to exclude every reasonable hypothesis but that of guilt' ".

In United States v. Dolasco, 3 Cir., 184 F.2d 746, 748, we find:

"The question to be decided on the first is whether the case should have been submitted to the jury. Some vital portions of the government's case were based on circumstantial evidence. The rule with regard to this type of evidence is that for a conviction the evidence must exclude every reasonable hypothesis of innocence. It may well be that the rule is archaic and based upon mistaken premises. It has, however, been reiterated many times in this and other circuits and the present case does not call for reconsideration of its correctness. * * *"

In Gargotta v. United States, 8 Cir., 77 F.2d 977, at page 981, this court stated:

"This court has frequently announced and committed itself to the rule: 'Unless there is substantial evidence of facts which exclude every other hypothesis but that of

guilt, it is the duty of the trial judge to instruct the jury to return a verdict for the accused, and where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of this court to reverse a judgment against the plaintiffs in error.' * * *"

Viewing the evidence in the light most favorable to the Government and giving it the benefit of all reasonable inferences, we are convinced by the entire record that there is no substantial evidence to warrant a finding of intent on the part of the defendant Seals to injure or defraud the bank. It appears to us that the evidence is at least as consistent with innocence as it is with guilt. The trial court erred in overruling the defendant Seals' motion for judgment of acquittal made at the close of all the evidence, and by reason thereof this case must be reversed.

In view of the conclusion hereinabove reached, it is unnecessary to pass upon other errors urged for reversal.

The judgment of the District Court is reversed, and this case is remanded to the District Court with directions to enter judgment of acquittal as to the defendant Seals.