**Frank RIOS, Jr., Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 16925.**

United States Court of Appeals
Ninth Circuit.

Oct. 7, 1960.

Ernest M. Best, Walter East Hempstead, Jr., Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Robert J. Jensen, Minoru Inadomi, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before BARNES and JERTBERG, Circuit Judges, and LING, District Judge.

**PER CURIAM.**

Appellant was convicted by a jury on two counts of facilitating the sale and transportation of heroin in violation of 21 U.S.C.A. § 174. The jurisdiction of the district court was predicated on 18 U.S.C.A. § 3231, and this court has jurisdiction of the appeal pursuant to 28 U. S.C. §§ 1291, 1294.

Counsel for appellant characterizes "any appeal as one chance in a million," and that "the whole appeal process is ruled into predetermined absurdity." He states "there are no disputed facts whatsoever in this entire record or the Reporter's Transcript." Yet he says the appellant denied what the police officer had testified to concerning the participation by Rios in facilitating the transportation and sale of heroin. This police testimony, says counsel for appellant, only "*implies*" knowledge of the violation, of the narcotic laws by the defendant Rios, and only "suggests by words of the officer" that the appellant was remotely connected with the traffic. Despite his disapproval of appellate procedures, he asks a reversal of the conviction by this appeal.

From the transcript we read that defendant Rios was sitting in his Chevrolet automobile with his six year old son at a service station. Somewhere between six and twenty feet away an undercover officer was attempting to make a purchase and obtain delivery of heroin. Co-defendant Garcia, also known as "Tito," approached the agent, Gjertsen, displayed a packet with a number of white capsules in it and said (testimony of Gjertsen on direct examination):

" 'This is the connection and he is going to pick up and he is going to pick up for the fellow in the Chevrolet and I just told him that we would like to get hold of a quarter ounce and he says he can do it, but you have to advance the $75.'

"He says, 'The man is okay and he won't burn you for your money. He won't steal your money,' and he says, 'As proof, the guy is holding right now,' and he displayed this packet of, oh, I would say 15 to 18 capsules.

"So I got out of the car when I saw the capsules, I got out of the car and Garcia walked back to Ross Ruiz and gave him the packet of capsules, and I spoke to Ross Ruiz and I said, 'Look, I want to pick up a quarter ounce, but,' I said, 'I have been burned too many, times and I don't want my money out front.'

"By Mr. Bevan:

"Q. Were you still at your automobile at that time? A. No. I got out and approached Ross Ruiz in the company of Jesus Garcia.

"Q. How close were you to the defendant Rios at this time? Did you move any closer? A. Yes. We were right next to his car, about eight feet, six or eight feet.

"Q. The driver's or passenger's side? A. Of the car, that would be the passenger side.

"Q. Was Mr. Rios seated in the driver's side? A. Yes.

"Q. Proceed. What was the conversation? A. I told Ruiz I wouldn't let the money go out front, I wouldn't turn loose of the money. I said, 'I got my car and my partner sitting there and,' I said, 'if you are going to go pick up, I will follow you out to the area and then I will give you the money, because I want a guarantee that you don't steal my money without bringing back the heroin.'

" 'Well,' he says, 'No,' he says, 'When I go pick up, I am not going to let these two guys,' referring to Garcia and Rios, Frank Rios, Jr., he said, 'When I go pick up, they are not going to meet the connection, either, but,' he says, 'I am going to let them follow me to the immediate area and then I will go make the connection and I will bring them their stuff and they can bring you your stuff.' He says, 'You can't come with me in my car, but,' he said, 'talk to the other guy and if he will let you go in his car, it's all right with me.'

"Q. Did he indicate anyone? A. Yes, Frank Rios, Jr. I turned and stuck my head into the car of Frank Rios, Jr., and I said, 'Look, I want to pick up a quarter piece and this guy won't let me follow in my car and he won't let me go in his car. How about if I go along with you?'

"He said, 'No, man. Look,' he said, 'If we are going into an area where there is a lot of police and sheriffs in the area'—he said, 'When I go pick up, I don't want anybody in the car with me because when you get two more people in the car, the sheriff stops you and,' he said, 'When I pick up, I always take the kid along with me and they don't bother me. If you get into the car, you might have some heat on you and Tito is going to get in the car and I know we will get busted.'

"So he said, 'No, you can't come with me.'

"I turned around and I said, 'Look,' I talked to Ross Ruiz, I said, 'I will agree to this. I trust Tito. I will let him have the $75. He can go. He will go with you.'

"He said, 'No, he is not going with me,' and he said, 'Let him go with Rios.'

"So I said, 'Okay, he can go along with this man.'

"Ruiz said, 'He will go with this guy and they can follow me and you go over to Tito's house and wait at Tito's house and the deal will only take about an hour and you will have your stuff in about an hour.'

"So then I turned to Frank Rios' car and talked with—at that time Jesus Garcia was getting into the car of Frank Rios, Jr., and I said, 'Well, look, you take care of my money and see I don't get burned and I will meet you back at your house.'

"Q. Had you already given some money to Mr. Garcia at this time? A. Yes. Already I had given him

$75 official government funds in the presence of Ross Ruiz.

"Jesus Garcia got into the Chevrolet and then Ross Ruiz pulled ahead in the Ford and he stopped and called back and he said, 'I am going to be watching and,' he said, 'if you follow me, the deal is off, so don't follow.'

"I said, 'I am not going to follow and I will be over at Tito's house.'

"He said, 'Okay. Good.'

"So Ruiz drove off toward the freeway and Frank Rios, Jr., and Jesus Garcia and the child headed in the same direction and followed the Ford and they went off in the direction of the freeway.

"Q. What did you do then? A. I then, as per instructions of Ruiz, went over to 406½ Bauchet Street, the residence of Garcia.

"Q. Did you later see Mr. Garcia there in the evening? A. Yes, I did.

"Q. About how long after this? A. Oh, it was pretty late. It was about 11:30, 11:50, close to midnight.

"Q. Did you have a conversation with the defendant Garcia? A. Yes, I did. Garcia at that time, I was parked in the rear of his house, in the back parking area, and Garcia came up to the car and he handed a rubber contraceptive, a white powder, to my partner, handed it across me to my partner and my partner accepted it.

"He said, 'I am sorry for the delay, but,' he says, 'We had to go all the way out to City Terrace and we had a big hassle and,' he says, 'I tried my best to get back as fast as I could.' He says, 'Were you worried about it?'

"I says 'No, I wasn't worried. After talking to your wife, she told me you had called and everything was all right.' So I said, 'After she told me that, I was no longer worried that anything was wrong, so I just waited here.' I said, 'How did you get back yourself?'

"He says, 'A guy in the Chevrolet, after we picked up, he picked up, we picked up three balloons, three quarter pieces,' and he said, 'Ross got one and Rios got one and I got this one.'

"I said, 'How did you get back here?' I said, 'You came up on foot.'

"He says, 'Well, Rios drove me down to a bus station, after we picked up he drove me to the bus line. I wanted him to drop me off here and he said, "I don't want to take you to where those guys are waiting," ' so he got on the bus and came back."

Thus, according to the testimony of the agent Gjertsen, appellant Rios knowingly transported Garcia to the place where both Garcia and Rios could buy narcotics. Garcia stated not only that he had gone to get the narcotics with Rios in Rios' Chevrolet, but that Rios had driven him part of the way back. Garcia returned with the heroin.

■■■ Thus there was substantial evidence to support the verdict of the trial court, unless we assume agent Gjertsen testified falsely. We are required to regard the evidence and all inferences that may be drawn therefrom most favorably in support of the judgment of the trial court. Sandez v. United States, 9 Cir., 1956, 239 F.2d 239. We cannot substitute our judgment for that of the trier of facts below where there is a conflict in the evidence. Glasser v. United States, 1941, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.

"Facilitate," as used in this statute (21 U.S.C.A. § 174), has been defined as follows: "to make easy or less difficult; to free from difficulty or impediment; as to facilitate the execution of a task." Cellino v. United States, 9 Cir., 1960, 276 F.2d 941, 943; Bruno v. United States, 9 Cir., 1958, 259 F.2d 8; Pon Wing Quong v. United States, 9 Cir., 1940, 111

F.2d 751. There was here proof appellant facilitated a sale of narcotics within the meaning of that word in the statute.

Appellant next charges prejudicial misconduct on the part of government counsel in argument to the jury. Appellant misquotes the evidence, interprets it to suit his purpose, and relies on wild flights of oratorical fancy. Such cannot take the place of hard facts, represented by the language of the transcript.

There is no merit in this, or any, aspect of this appeal. The judgment of conviction is affirmed.