Stephen R. BENCHWICK, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 17389.

United States Court of Appeals
Ninth Circuit.

Dec. 4, 1961.

E. D. Crumpacker, Honolulu, Hawaii, for appellant. Crumpacker & Sperry, Honolulu, Hawaii, of counsel.

Herman T. F. Lum, U. S. Atty., Honolulu, Hawaii, for appellee.

Before POPE, MERRILL and BROWNING, Circuit Judges.

BROWNING, Circuit Judge.

The defendant, a depositor in the Aiea Branch of the Bank of Hawaii, was found guilty of having aided and abetted [1] the Branch Manager in the willful misapplication of the funds of the Bank.[2] The case was tried to the Judge, the defendant having waived a jury. The defendant's principal contention on this appeal is that the evidence was insufficient to sustain the conviction. The defendant al-so urges that the District Court erred: (1) in refusing to enter special findings of fact at the close of the government's case; and (2) in admitting evidence as to certain events which occurred subsequent to the period covered by the information. We have concluded that the evidence was sufficient and that there was no reversible error in the rulings referred to. We therefore affirm.

The essential facts are not in dispute. Late in 1958 the defendant began trading in the stock market. During the period December 19, 1958, through December 17, 1959, he drew 22 checks on his account at the Aiea Branch of the Bank of Hawaii payable to his broker for the purchase of securities. The first three checks were paid by the Bank and charged to the defendant's account in the normal manner. A fourth check in the amount of $10,848 was presented to the Bank early in April, 1959, when the balance of the defendant's account was only $2,242.21. The Branch Manager contacted the defendant, who agreed to come in and cover the check. The check was then paid. Instead of charging it to defendant's account where it would have created an overdraft of some $8,000, the Branch Manager charged it to a so-called Deferred Items account, used for temporary recording of items which for some reason could not be cleared immediately. Normally, items charged to Deferred Items remained in that account no longer than twenty-four hours, but the defendant's check was held there for eleven days, and was charged to the defendant's account only after the defendant had deposited sufficient funds to cover it.

The pattern thus initiated continued for a period of eight months. Seventeen of the 19 checks which were thereafter drawn by the defendant in favor of his

---

1. "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a).

2. "Whoever, being an officer, director, agent or employee of * * * any * * * insured bank * * * willfully misapplies any of the moneys, funds or credits of such bank * * * shall be fined not more than $5,000 or imprisoned not more than five years, or both; * * *." 18 U.S.C. § 656.

broker were drawn on insufficient funds. Four of the 17, ranging in amounts from $18,133 to $60,325, were presented when the defendant's account was already overdrawn, and his balance when each of the remaining 13 checks was presented was generally only a fraction of the amount of the check. All 17 of the checks drawn on insufficient funds were charged to the Deferred Items account by the Branch Manager. The first 14 of these 17 checks were held in that account for periods averaging more than two weeks, and running as long as 27 days, until funds were received to pay them. They were then charged to the defendant's account. The last three checks remained in the Deferred Items account—they were never paid.[3]

Holding the defendant's checks in the Deferred Items account resulted in both concealment of the overdrafts and loss to the Bank. If charged to the defendant's account the checks would have appeared as overdrafts both in that account and in monthly overdraft reports to the Bank's central office. Aside from other steps which might have been taken, each overdraft would then have been subject to a penalty charge or interest, whichever was greater.

Two other affirmative acts of concealment by the Branch Manager were disclosed by the evidence: In May, while federal and state auditors were engaged in checking the Aiea Branch, two of defendant's checks totaling over $11,000 were transferred out of the Deferred Items account to a record status which indicated that they had been cleared from that account and returned to the head office, and the same procedure was followed again in December with respect to the final three checks totaling $82,850.

■■ The defendant's argument as to the insufficiency of the evidence be-

gins with two unimpeachable generalizations—first, that an intent to injure and defraud the bank is an essential element of the offense under 18 U.S.C. § 656. [Evans v. United States, 153 U.S. 584, 592, 14 S.Ct. 934, 38 L.Ed. 830 (1894); Seals v. United States, 221 F.2d 243, 245 (8th Cir., 1955); and United States v. Wicoff, 187 F.2d 886, 890 (7th Cir., 1951)]; and, second, that since overdrafts may be the means of initiating a legitimate bank loan, the requisite intent "cannot be inferred, as a matter of law, from the mere fact that when the check was drawn there were not funds on deposit to meet the check * * *." Dow v. United States, 82 F. 904, 908 (8th Cir., 1897).[4] The defendant suggests that the only evidence of the Branch Manager's intent to defraud the Bank was that he had manipulated the Bank's records so as to conceal the overdrafts. The Branch Manager affirmatively testified that he had not told the defendant about these irregular banking procedures. The defendant thus concludes that the only evidence that he shared the Branch Manager's fraudulent intent was the fact that he knowingly submitted checks in excess of his balance—which was not adequate proof of intent under the rule of the Dow case.

■ An aider and abettor must, of course, know that a wrong is to be committed, United States v. Turnipseed, 272 F.2d 106, 107 (7th Cir., 1959). However, it is not necessary that he know the *modus operandi* of the person whom he is charged with aiding and abetting. McClanahan v. United States, 230 F.2d 919, 924 (5th Cir., 1956); Russell v. United States, 222 F.2d 197, 199 (5th Cir., 1955). It would have been sufficient in the present case to show that the defendant shared the Branch Manager's criminal purpose to injure and defraud the

---

3. The information was in 13 counts, one count for each of the last 13 checks drawn to insufficient funds.

4. See also Logsdon v. United States, 253 F.2d 12, 14 (6th Cir. 1958); Seals v. United States, 221 F.2d 243, 245 (8th Cir. 1955); United States v. Klock, 210 F.2d 217, 220–221 (2d Cir. 1954); United States v. Broxmeyer, 192 F.2d 230, 233–234 (2d Cir. 1951); United States v. Marinelli, 142 F.2d 446 (3d Cir. 1944); and Johnson v. United States, 95 F.2d 813, 817 (4th Cir. 1938).

Bank. Hall v. United States, 286 F.2d 676, 680 (5th Cir., 1960); Morei v. United States, 127 F.2d 827, 831 (6th Cir., 1942). Knowledge of the Branch Manager's specific acts of concealment would have been relevant evidence that defendant had the requisite intent, but it was not the only possible evidence.

The District Court specially found that the defendant knew that the Branch Manager "willfully mishandled or concealed [the defendant's checks] contrary to bank regulations or made false entries in order to misapply money of said Bank for the use and benefit of the defendant, with intent to injure said Bank,"—and this finding was amply supported by the record. (1) The repeated drawing and payment of checks over an extended period in amounts grossly in excess of the defendant's balance was itself a relevant circumstance bearing upon defendant's knowledge and intent.[5] (2) Defendant admittedly knew that the Branch Manager's conduct gave him the use of substantial amounts of the Bank's money during the periods in which the checks were held. He paid no interest for the use of these funds and gave no security for their repayment. During the same period the defendant arranged a number of both secured and unsecured loans with the Bank. In each instance, he was required to provide security for loans of any substantial amount and he was charged interest on all loans, secured or unsecured. Although the defendant's

largest loan was for $14,000, secured by a mortgage on his home, and his largest unsecured loan was for $1,156.88, the checks at issue ranged as high as $70,400. It must have been obvious to the defendant that the advances made to him by the withholding of his checks vastly exceeded his reasonable credit. (3) It appeared from the face of his monthly bank statements, introduced by defendant at the trial, that the checks involved in his stock transactions were handled in an irregular manner. Overdrafts appeared on his statements in red and were subject to a charge. But the checks involved here, though normally far in excess of his balance, did not appear on his statement at all until he had arranged to pay them. On a number of occasions his deposit, when finally made, did not quite meet the outstanding check, so that the appearance of the deposit and of the withheld check simultaneously on his statement left a small overdraft. In these instances, the deficiency appeared in the defendant's bank statement as a normal overdraft, though, as defendant must have known, the overdraft thus recorded represented only a small part of the total deficiency for a small part of the period in which it existed. (4) On at least four occasions, small overdrafts which appeared on defendant's bank statements were adjusted by deposits, but at the same time actual overdrafts in much larger amounts, reflected in checks which were being withheld while the recorded overdrafts were being cleared up, were

---

5. The defendant argues that the requisite specific intent to injure or defraud the bank may not be presumed from a reckless disregard of the bank's interests. It is true that where specific intent is required by the statutory definition of an offense, it may not be supplied by a conclusive presumption from given facts, since that would, in effect, eliminate the requirement of specific intent from the statute. Cf. Morissette v. United States, 342 U.S. 246, 255–256, 72 S.Ct. 240, 96 L.Ed. 288. We therefore agree that defendant's intent to injure and defraud the bank could not be inferred as a matter of law from any particular circumstance, even the long-continued practice of drawing checks on insufficient funds. Defendant's intent was a matter of fact. And specific intent, like any other fact, may be inferred from all the relevant circumstances, including those referred to. Indeed, this is almost always necessary, since direct proof of intent is rarely available. Hall v. United States, 286 F.2d 676, 679 (5th Cir. 1961), cert. denied 366 U.S. 910, 81 S.Ct. 1087, 6 L.Ed.2d 236; Morrissey v. United States, 67 F.2d 267, 277 (9th Cir. 1933), cert. denied 293 U.S. 566, 55 S.Ct. 77, 79 L.Ed. 666.

neither recorded on defendant's bank statements as overdrafts, nor paid.[6]

From these and similar facts in the record, the District Court could well have concluded that defendant knew that the Branch Manager was fraudulently misapplying the funds of the Bank with intent to do it injury by converting its credit to the use of the defendant without interest or security. Hall v. United States, 286 F.2d 676, 680–681 (5th Cir., 1960), cert. denied 366 U.S. 910, 81 S.Ct. 1087, 6 L.Ed.2d 236; United States v. Nystrom, 237 F.2d 218, 225 (3d Cir., 1956).[7] The fact that the Branch Manager and the defendant intended that the uncompensated use should be temporary and that the funds should ultimately be restored does not alter the case. Agnew v. United States, 165 U.S. 36, 57, 17 S.Ct. 235, 41 L.Ed. 624 (1897); Kramer v. United States, 190 F.2d 712, 719 (4th Cir., 1951).

But the defendant further argues that even if it is assumed that he shared the Branch Manager's unlawful purpose to injure and defraud the Bank, he could not properly be convicted on the present record because the evidence reflects only a negative acquiescence in the criminal enterprise and not that participation or collaboration which is required to make one an aider and abettor. Robinson v. United States, 262 F.2d 645, 648–650 (9th Cir., 1959); Johnson v. United States, 195 F.2d 673, 675–676 (8th Cir., 1952).

Here again, we accept the defendant's legal premise but conclude that the District Court made the necessary finding upon an adequate record. The District Court specially found that there was "collaboration or association between defendant and William Moss Vannatta in said willful misapplication with intent to injure or defraud" the Bank. It seems to us to be beyond argument that this record disclosed a single joint course of conduct by the defendant and the Branch Manager, in which each played an affirmative and essential role.[8]

---

6. For example, on November 10 the defendant's bank account showed an overdraft of $993.49. On November 13, defendant deposited $4,929, and as of that date his bank statement reflected a net balance of $3935.51 in his favor. Yet he then had outstanding two checks totaling $72,800 which had been paid by the bank but did not appear on his bank statement, and his real balance was a net unrecorded overdraft of $68,864.49. The two checks outstanding did not appear on defendant's bank statement until he made a deposit to cover them more than two weeks later.

7. Defendant points to the fact that the Branch Manager requested the defendant to execute four interest-bearing 30-day notes to cover existing or contemplated overdrafts, and that the defendant did so, and argues that this fact is inconsistent with the inference that defendant knew the Branch Manager was handling his account in an irregular manner. The notes were small (about $1,000). One, and possibly two, were executed to cover overdrafts which appeared on the face of defendant's bank statement. The other two were executed in connection with the settlement of previously withheld checks, in one instance a single check for $2,500, and in the other, two checks totaling $72,800. The two notes, as the defendant necessarily knew, did not reflect either the actual amount of the two overdrafts nor the actual periods for which he had the use of the Bank's money. Moreover, as he also knew, in most instances his checks were paid and withheld from his account without requiring him to execute notes at all—for any period or in any amount. These circumstances might well be regarded as supporting the inference that defendant knew of the Branch Manager's fraudulent misapplication. And, of course, on this appeal "[We] are required to regard the evidence and all inferences that may be drawn therefrom most favorably in support of the judgment of the trial court." Rios v. United States, 283 F.2d 134, 136 (9th Cir. 1960).

8. In addition to the detailed evidence regarding the drawing and subsequent handling of defendant's checks, the record disclosed that the defendant and the Branch Manager were in constant communication regarding the transactions in issue, arranging in advance for the drawing of the checks, arranging later for their payment, and so forth.

Defendant's argument seems to be that the essence of the offense was the Branch Manager's acts of concealment, and that defendant could be convicted as an aider and abettor only if he collaborated directly with the defendant in the performance of those acts of concealment. On the contrary, the essence of the offense was the conversion of the Bank's funds with intent to injure and defraud. The Branch Manager's acts of concealment were a part of his contribution to the common offense, and evidenced the intent with which the conversion was accomplished. Knowing participation in the scheme was sufficient to render the defendant an aider and abettor, though his contribution and that of the Branch Manager may have been complementary rather than identical. If with knowledge of the fraudulent misapplication by the Branch Manager the defendant "continued * * * to engage in a course of conduct which so misapplied the funds of the bank and which required the expected collaboration of the cashier to make it successful, we think the evidence was sufficient to take the case to [the trier of fact] on the issue of aiding, abetting, or inducing." Logsdon v. United States, 253 F.2d 12, 15 (6th Cir., 1958).

Defendant relies heavily upon the dissent of Judge (now Justice) Potter Stewart in the Logsdon case. Judge Stewart felt that an instruction given to the jury in that case could be interpreted as permitting the conviction of the defendant as an aider and abettor if the jury believed no more than that the defendant issued checks knowing that they would be paid by the cashier although both the defendant and the cashier knew that the checks were drawn on insufficient funds. The majority in the Logsdon case were satisfied that the case had not been con-

sidered upon so confined a theory, and as we have said, we are similarly satisfied in the present case.[9]

We conclude that there was sufficient evidence to support the verdict.

█ At the close of the government's case, the defendant moved for judgment of acquittal and for special findings. The motion was denied. Defendant then produced evidence in his own defense. He now asserts that the trial court may have applied the wrong legal standard in ruling upon the motion for judgment of acquittal. He recognizes that this cannot be demonstrated in the absence of special findings, and argues that for this reason the trial court was required to enter the special findings so that defendant might have an effective review on appeal. The answer, it seems to us, is that defendant could have had his special findings at the close of the government's evidence by resting on his motion and declining to go forward with his proof. Rule 23(c), Federal Rules of Criminal Procedure, 18 U.S.C.A. Having elected to proceed, the defendant waived any error the trial court might have made in denying the motion to acquit at the close of the government's case. Maulding v. United States, 257 F.2d 56, 58, 17 Alaska 592 (9 Cir., 1953); Lii v. United States, 198 F.2d 109, 112 (9 Cir., 1952); Mosca v. United States, 174 F.2d 448, 451 (9 Cir., 1949). Rule 23(c) contemplates a single set of special findings entered at the time of the entry of the general findings. That was the procedure followed in the present case, and it seems to us to be the only practicable one. This may sometimes present the defendant with a hard choice, but that is true in many situations which may confront litigants in the course of almost every trial, and provides no basis for exempting the

9. In the present case, as in United States v. Marinelli, 142 F.2d 446, (3d Cir. 1944), the offense "was not the appellant's mere drawing of checks without sufficient funds in the bank to cover them as the appellant mistakenly conceives. The crime involved the misapplication of the bank's funds by its cashier and the appellant's participation therein as the

wilful drawer of worthless checks from time to time in significantly large amounts, which the cashier honored and then concealed so as not to disclose the overdraft, was sufficient in the circumstances known to or knowable by the appellant to make him an aider and abettor of the cashier's dereliction. * * * "

defendant from the provisions of the rule. Compare United States v. Woodbury, 263 F.2d 784, 787–788 (9th Cir., 1959).

 Finally, the defendant argues that the trial court erred in admitting evidence relating to acts subsequent to the period of the information. The substance of this evidence was that defendant came to believe, mistakenly, that the market price of his stock had so diminished that its total value was not sufficient to cover his outstanding obligations; that he thereupon sold the stock and, in an effort to recoup his losses, dissipated a large part of the proceeds at the gambling tables in Las Vegas, Nevada. He was unable to cover his last three checks, and the Bank thereby lost $82,850. The evidence was objected to as irrelevant. An examination of the whole record indicates that where the only ground of objection to the admission of evidence was irrelevance, the trial judge's intention throughout the trial was that the evidence should be admitted as a formal matter, reserving for later determination the question of which part of the evidence, if any, properly should be considered. This was true of evidence offered by both sides. The procedure followed by the District Judge in this case is common practice in cases tried to a judge without a jury, and it is also common practice on appeal in such cases to assume, in the absence of some contrary indication, that the trial court in its ultimate determination considered only the relevant evidence. Penosi v. United States, 206 F.2d 529, 531 (9th Cir., 1953); Pasadena Research Laboratories v. United States, 169 F.2d 375, 385 (9th Cir., 1948) cert. denied 335 U.S. 853, 69 S.Ct. 83, 93 L.Ed. 401.[10] Nonetheless, we have examined the evidence objected to and have concluded that it bore upon the question of defendant's prior intent. The weight to be assigned to it may be arguable, but that question is not before us. When the defendant's intent is at issue, a wide range of evidence as to subsequent acts may well be relevant to the issue of prior intent, and hence be admissible.[11] The evidence in the present case concerned the disposition made of the proceeds of the checks which were the basis of Counts 11, 12 and 13. Evidence as to the disposition made of the proceeds of the checks involved in defendant's stock speculation, including the 10 checks which formed the basis for the first 10 Counts of the information, was received without objection. The fact that similar evidence as to the last three checks was adverse to the defendant did not make it irrelevant. The drawing and payment of the checks, the use of the proceeds to purchase stock, the ultimate sale of the stock and the use of the proceeds to cover the withheld checks or, finally, in gambling, were all parts of a single continuous chain of events, and evidence as to the entire course of these connected transactions was relevant to a determination of the state of mind with which the defendant played his part in these events.

The judgment is affirmed.

10. Compare Fotie v. United States, 137 F. 2d 831, 839 (8th Cir. 1943), where the presumption yielded, as of course it must, to a showing that the trial court had in fact given weight to the contested evidence. The affirmative indication in the present record is that the District Court did not consider the evidence objected to in arriving at the judgment, since no acts subsequent to the information period are mentioned in the Judge's oral summary of the case prior to announcing his verdict. On the other hand, the fact that defendant went to Nevada, leaving his family behind him, and gambled away substantial sums of money was referred to by the court below at the hearing with respect to the amount of bail, where it was obviously relevant.

11. Waller v. United States, 177 F.2d 171, 175–176 (9th Cir. 1949); Shreve v. United States, 103 F.2d 796, 801 (9th Cir. 1939), cert. denied 308 U.S. 570, 60 S.Ct. 84, 84 L.Ed. 479.