**BLACKFORD v. UNITED STATES and seven other cases.**

**Nos. 4316–4323.**

United States Court of Appeals Tenth Circuit.

Feb. 5, 1952.

Rehearing Denied Feb. 21, 1952.

Writ of Certiorari Denied May 12, 1952. See 72 S.Ct. 1041.

Kenneth C. West and Walter A. Raymond, Kansas City, Mo. (William W. Cochrane and William Farmer, Kansas City, Mo., on the brief), for appellants.

Malcolm Miller, Asst. U. S. Atty., Topeka, Kan. (Lester Luther, U. S. Atty., and Eugene W. Davis, Asst. U. S. Atty., Topeka, Kan., on the brief), for appellees.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

These are appeals from judgments of the United States District Court for the District of Kansas entered upon verdicts of a jury finding the appellants, herein referred to as defendants, guilty of conspiring to violate the provisions of the Na-

tional Stolen Property Act, 18 U.S.C.A. § 415, 1948 Code, 18 U.S.C.A. § 2314.

The defendants were charged by indictment containing two counts. In substance, count one charged that from on or about June 20, 1948, to July 7, 1948, defendants entered into an agreement, confederation and conspiracy to violate the provisions of 18 U.S.C.A. § 415, in that they conspired, confederated and agreed to transport and caused to be transported in interstate commerce, wheat of the value of more than $5,000 theretofore stolen, feloniously converted, and feloniously taken by fraud. Twenty overt acts which were alleged to have been committed in furtherance of the conspiracy were set out. These overt acts outlined the conduct of the defendants relating to the alleged offense.

Count two charged the defendants with the substantive offense of knowingly transporting or causing to be transported in commerce during the same period of time, wheat which had theretofore been stolen, feloniously converted and taken feloniously by fraud of the value of more than $5,000 in violation of the National Stolen Property Act. Trial was had to a jury which found all defendants guilty of the conspiracy as alleged in count one, and failed to agree upon a verdict on count two.

Ten assignments of error were designated in the record. However, in defendants' brief they are regrouped into three assignments. All relate to the sufficiency of the evidence to sustain the verdicts and judgments and may be disposed of together.

While there is some conflict in the evidence, many of the facts are admitted and there is a considerable amount of testimony concerning which there is no dispute. The essential facts may be summarized as follows:

On the afternoon and evening of June 29, 1948, and continuing to 1:20 a. m., June 30, 1948, five large tractor trailer trucks owned by the defendants, Hans Nielsen, William W. Blackford, and George Nielsen, and driven by the defendants, Robert Hager, Paul Blackford, Ronald L. Hawk, Marshall Weddle, and Carroll D. Hager, entered Kansas from Colorado through the Port of Entry at Syracuse, Kansas. On his application at the Port of Entry, each defendant represented that he came from Lamar or Pueblo, Colorado, and was en route to Deerfield, Kansas, to obtain 30,000 pounds of wheat to be transported to Dallas, Texas. On June 30, defendant, William W. Blackford, appeared at the McCoy Grain Company which operated two elevators at Sublette, Kansas, and represented himself to be a Mr. Long, of the Long Grain Company, and agreed to purchase for the Long Grain Company a number of truckloads of wheat. On the same day, the five tractor trailer trucks, having a capacity of about 1000 bushels of wheat each, came to Sublette and were loaded with 2530 bushels of wheat. Each truck carried approximately 500 bushels. It was admitted that defendants paid $5,327 cash for this wheat, or $2.07 per bushel; that these trucks were driven by defendants, Carroll D. Hager, Ronald L. Hawk, Paul Blackford, Marshall Weddle, and Robert Hager; that the trucks left Kansas through the Port of Entry at Liberal, Kansas; that the wheat was a part of 3219 bushels and 40 pounds admittedly sold by them on July 1, 1948, to the Kimball Milling Company, in Woodward, Oklahoma, for $6,529.31; and that part of the wheat sold tested 59 pounds and was sold for $2.03 per bushel and that the balance tested 58 pounds and was sold for $2.02 per bushel.

It was also admitted, or the evidence was without conflict, that purchases of wheat were made by the defendants in the same manner on July 1, July 4, July 5, and July 6, 1948; that the total purchases consisted of 24 truck loads for a total of approximately 12,000 bushels at a cost of over $25,000; that in each instance the defendants requested that 500 bushels be loaded on to each truck; and that in each instance, shortly after the loading of the trucks, they passed through the Port of Entry at Liberal, Kansas, where it was represented that the destination of the trucks was Amarillo, Texas. Within a short distance from the Port of Entry, which is about thirty miles south of Sublette, the trucks on each occasion left the highway leading to Amarillo and arrived shortly thereafter at Woodward, Oklahoma,

where the 24 loads were sold. Upon arrival at Woodward, each truck carried the same grade of wheat as that purchased at Sublette, but each load contained substantially more wheat than that so purchased, and it was sold at an average of 6 cents per bushel less than the purchase price. The defendants paid for 12,120 bushels of wheat which was loaded upon the 24 trucks, and sold therefrom approximately 22,000 bushels for which they received over $21,000 more than they paid for the wheat at Sublette.

In making the five round trips during this period, the defendants on each trip passed through the Port of Entry at Liberal, Kansas. In all instances the applications executed at the Port of Entry gave the starting point of the vehicles as Amarillo, Texas, and the place to which wheat was to be transported likewise was given as Amarillo, Texas. In some instances, the "destination or turn about point of vehicle" was given as Sublette, Kansas, and in some as Garden City, Kansas. There is no evidence or claim that any of these trucks ever went to Dallas, Texas, or to Deerfield, Kansas, for an additional load, as stated in the Syracuse Port of Entry applications, or to Garden City, Kansas, or to Amarillo, Texas. So far as the record shows, the trucks, during this period, operated only between Sublette, Kansas, and Woodward, Oklahoma, and transported wheat purchased only at Sublette.

The evidence is without conflict that throughout the harvest season of 1948 only 25 trucks were loaded out of the McCoy elevator in Sublette. One was a Chevrolet truck owned by a farmer, and is not involved, and the remaining 24 trucks that were loaded admittedly are the trucks of the defendants. There are a number of grain loading spouts located in the truck driveway of the McCoy elevator from which trucks may be loaded with wheat by the use of ropes which are alongside the trucks being loaded. Four individuals testified that at some time during the latter part of June or the early part of July, 1948, the exact date of which they could not state, they were in and around this elevator and saw large trucks being loaded in the driveway of this elevator and that wheat was flowing into the trucks from more than one grain spout. The purchased wheat was weighed by automatic scales located near the top of the elevator. As it was weighed it was released through one certain grain spout into the trucks. The spouts that these witnesses referred to were shown to include others than the one from the scales.

There were only two employees at the elevator when trucks were being loaded, one was required to be at the top of the elevator building operating the automatic scales, and the other was engaged in getting wheat of the grade desired to the scales and could not see what was being done on the trucks as they were being loaded. The trucks on all occasions appeared for loading late in the afternoon and usually delivered loads of the same grade of wheat at Woodward about midnight following. There was reliable evidence to the effect that the Sublette elevator was short approximately 6000 bushels of wheat over the harvest period of 1948 and that the shrinkage should not have been more than 1700 bushels. Because of factors over which there is no control, it is impossible to determine with certainty shrinkage of wheat handled by an elevator. In some types of elevators the average appears to be about one-half of one per cent of the wheat handled, while in others it is much less.

■ It was admitted that the defendants owned and operated the trucks during the period and were acting together in the purchase and sale of the wheat in Kansas and adjoining states. The defendants contend, however, that there is no evidence of an unlawful conspiracy to transport wheat interstate. They also assert that even if it be assumed that there existed an unlawful conspiracy, it was established by circumstantial evidence, and therefore it was necessary to prove that in carrying out the conspiracy, wheat of the value of $5,000 or more was actually transported; otherwise the evidence was insufficient to show that the defendants agreed or conspired to transport interstate, wheat of the statutory value. To establish the conspiracy, the

prosecution relied upon circumstantial evidence. Conspiracies are seldom proved by direct evidence and convictions for conspiracy will be upheld if the circumstances, acts and conduct of parties are sufficient to establish them. Carlson v. United States, 10 Cir., 187 F.2d 366, certiorari denied 341 U.S. 940, 71 S.Ct. 1000, 95 L.Ed. 1367; Young v. United States, 10 Cir., 168 F.2d 242; Reavis v. United States, 10 Cir., 106 F.2d 982; Wilder v. United States, 10 Cir., 100 F.2d 177; Martin v. United States, 10 Cir., 100 F.2d 490, certiorari denied 306 U.S. 649, 59 S.Ct. 590, 83 L.Ed. 1048.

Considering the evidence as a whole and the inferences which may be reasonably drawn therefrom most favorable to the prosecution, as we are required to do on appeal, Carlson v United States, supra, we think there is sufficient evidence not only to sustain the jury's finding that there was an unlawful conspiracy, but that wheat of the value of more than $5,000 was transported interstate by the defendants who knew that it had been stolen or obtained by felonious fraud. The defendants traveling together with large transport trucks appeared at a comparatively small country elevator operated by only two employees, and there within a period of about six days, under a fictitious name, purchased sufficient wheat to fill 24 trucks only about one-half full. In disposing of the wheat within this period the defendants made five round trips to another small town in Oklahoma, which was more than 150 miles away, where they sold from the same trucks almost twice as much wheat of the same grade as that purchased, at a price substantially below the cost. Under all the circumstances presented here the jury had the right to infer that the wheat which was seen flowing into the trucks from grain spouts, other than the one leading to the scales weighing the purchased wheat, was being stolen or obtained by felonious fraud and constituted the shortage shown in the elevators at Sublette which had a value far in excess of $5,000.

Defendants contend that the failure of the jury to convict on the substantive count amounts to a finding that there was insufficient evidence of the interstate transportation of wheat of the value of $5,000 or more. Consistency in a jury's verdict is not necessary, and as was said in Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356, "Each count in an indictment is regarded as if it was a separate indictment." As we have heretofore stated, there is sufficient evidence to sustain the finding that the wheat which was stolen or obtained by felonious fraud and transported interstate was of the value of more than $5,000. This case is before us as though it had been tried only on the conspiracy count. United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48.

The judgments are affirmed.