**J. Phil BURNS, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 6346.**

United States Court of Appeals
Tenth Circuit.

Jan. 6, 1961.

Rehearing Denied Jan. 23, 1961.

Coleman Hayes, Oklahoma City, Okl. (Lynn J. Bullis, Jr., and Monnet, Hayes, Bullis, Grubb & Thompson, Oklahoma City, Okl., of counsel, were with him on the brief), for appellant.

Erwin A. Cook, Asst. U. S. Atty., Oklahoma City, Okl. (Paul W. Cress, U. S. Atty., Oklahoma City, Okl., was with him on the brief), for appellee.

Before BRATTON, PICKETT and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Appellant Burns, four other individuals and two corporations were prosecuted under a 31-count indictment charging violations of the Securities Act, the mail fraud statute, and the general conspiracy statute. The jury found Burns and one corporation guilty on the 15 counts under the Securities Act and not guilty on all other counts. Three of the other individuals and one corporation were convicted on all counts and one individual was acquitted on all counts. Burns was sentenced to five-year concurrent terms on each of the 15 counts of which he was convicted. He alleges as grounds for appeal the insufficiency of the evidence, the improper exclusion of certain evidence, and errors in the instructions.

The material portion of the Securities Act forbids the sale of any securities by the use of the mails in furtherance of a scheme to defraud.[1] The indictment relates to the sale of "certificate-bonds" which were issued by Selected Investments Corporation, an Oklahoma company, and which were securities within the purview of the act. Fourteen of the counts with which we are concerned charged the mailing of dividend checks and a copy of "Selected Investment News" and the remaining count charged the mailing of an identified letter. Burns and his co-defendants stipulated that the document or documents referred to in each of the 15 counts were in fact mailed. The evidence as to the scheme to defraud is overwhelming. The question of the sufficiency of the evidence to sustain the conviction of Burns goes only to the participation of Burns in the scheme to such

---

1. 15 U.S.C.A. § 77q(a) reads: "It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—(1) to employ any device, scheme, or artifice to defraud * * *."

an extent that he was responsible for the mailings which were made by others.

Selected Investments Corporation was organized about 1930 by co-defendant Carroll. It engaged in the sale of "certificate-bonds," the proceeds from which were assertedly placed in a trust fund pursuant to a trust indenture and were invested in various securities and "satellite" enterprises. In 1937, Carroll and another co-defendant, Riggs, organized United Securities Agency for the purpose of selling the certificates issued by Selected. The next year Burns who had for a short period been a vice-president and director of Selected resigned those offices and became president of United. By agreement between Selected and United, the latter had an exclusive contract for the sale of Selected certificates and handled all of such sales except for occasional sales made by officers of Selected.

United received commissions varying from 8½% to 10% for the sale of these certificates and split these commissions with Selected on a varying basis. A total of $51,000,000 of Selected certificates were sold to some 9,000 Oklahoma investors. The participation of United in such sales is shown by the fact that at the beginning of 1938 there were some $446,000 of certificates outstanding and when sales ceased in December, 1957, this had increased to over $39,000,000. For such sales United received commissions of over $6,100,000, of which it retained some $3,480,000 and paid to Selected $2,615,000.[2]

The trustee who ostensibly had control of the trust into which the sale proceeds were placed was an employee of Selected and acted under the supervision of its officers. Moneys received from certificate sales were placed in the trust and United was then paid its sales commissions. Six per cent annual dividends were paid to certificate holders in quarterly installments. Selected was paid a 2% management fee. It was represented that such

dividend and management fee payments were made only out of earnings whereas, in fact, they were in many years paid in whole or in part out of capital.[3] Certificates were redeemed at face value whereas the actual value was substantially less. The redemption of certificates stopped on December 1, 1957, and the sale of certificates was discontinued on December 8, 1957. State court receivership and federal bankruptcy proceedings followed early in 1958.

A detailed recitation of the operations of the Selected enterprise will not be helpful. It is enough to say that the record discloses a cleverly executed fraud of surprising longevity in which untrue statements of material facts and concealment of material facts were used to mulct the unwary investor. Our only concern is the participation of Burns in the fraudulent scheme.

For over 20 years Burns was associated with the convicted but not appealing co-defendants. As president of United he was the master salesman of Selected certificates and at times had 60 salesmen working under him. He trained them and distributed to them the Selected brochures and pamphlets which they used. By his own admission he attended about half of the directors' meetings of Selected and did so to obtain information "to pass on to the sales representatives over the state in order that our clients may have authentic and reliable facts concerning the company." The sales material stated that 6% dividends and a 2% management fee were paid from earnings when in fact they were not so paid. Although he knew that United received a sales commission varying from 8½% to 10%, he represented and approved representations that invested money went into a trust fund and that the managing company paid all operating expenses. At meetings of investors he represented that the satellite companies were profitable enterprises although he was on the board

2. During the period 1952–1957 Burns received as his personal income from the operation of United over $435,000.

3. At the end of 1957 the trust fund had an accumulated deficit of over $9,700,000.

of directors of one of those satellites which lost over $900,000 in a 6-year period.

On June 24, 1957, the Commissioner of Internal Revenue ruled that the dividend payments by Selected could not be deducted from taxable income for federal income tax purposes and that Selected was subject to taxation as a corporation.[4] In July, 1957, Carroll, the president of Selected, told Burns of this ruling. Yet, in the period from June 26 to December 8, 1957, United made 2,490 sales of certificates in the aggregate amount of $2,558,000 on which United received as its share of commissions $150,719. In September and October, 1957, Burns held meetings of investors to promote sales of certificates and did not disclose the tax ruling. After knowledge of the tax ruling, Burns cashed in $25,000 of certificates held by him.[5]

By his own admission Burns attended a series of meetings in the office of the president of Selected on November 18, 19 and 20, 1957, at which it was agreed to "freeze" redemptions of certificates on December 1, 1957, but to continue sales through January 1, 1958. In connection with sales it was agreed that the "asset value" would not be discussed when selling. At these meetings auditors stated that the "asset value" of the certificates was 77–78% of the face value. Following these meetings and between November 26 and December 8, 1957, United made 150 sales of certificates in the aggregate amount of $127,000 on which it received commissions of $7,001. Burns did not tell his salesmen of the tax ruling until December 8, 1957.

■ In the circumstances presented by the record it seems incredible that Burns could have been so artless and naive as not to have known what was going on around him. His activities after the November, 1957, meetings destroy every semblance of a claim of good faith. However, his counsel contend that acquittal on the conspiracy count requires acquittal on the Securities Act counts. The answer is that each count of an indictment is regarded as a separate indictment and consistency in the verdicts is not necessary.[6]

■■ Burns may not escape responsibility because he did not himself write, sign or post the letters.[7] He had knowledge of the use of the mails and he was a partner in the criminal enterprise. Acts in furtherance of that enterprise were in law his acts.[8] We conclude that the evidence was sufficient to sustain the conviction of Burns on each of the 15

---

4. The impact of such ruling was deadly. For example, in 1956, using round figures, there were earnings of $1,490,000, trustee expenses of $18,390, sales expense of $529,590, and charge-offs for bad debts in the amount of $352,500. This left a balance for distribution to certificate holders of $591,500. The distribution made was $1,960,000 or $1,369,000 in excess of earnings. The application of the 52% corporate income tax rate to the earnings would have drastically increased the deficit.

5. He had certificates of the face value of $26,500, against which there was a $5,000 loan. After the payment of the loan he received $20,000 and retained certificates of the face value of $1,500.

6. Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356; Blackford v. United States, 10 Cir., 195 F.2d 896, 899, certiorari denied 343 U.S. 945, 72 S.Ct. 1041, 96 L.Ed. 1350; Thomas

v. Hudspeth, 10 Cir., 127 F.2d 976, 978. Cf. United States v. Dotterweich, 320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48, rehearing denied 320 U.S. 815, 64 S.Ct. 367, 88 L.Ed. 492.

7. Cf. Palmer v. United States, 10 Cir., 229 F.2d 861, 865, certiorari denied 350 U.S. 996, 76 S.Ct. 546, 100 L.Ed. 861, rehearing denied 351 U.S. 958, 76 S.Ct. 844, 100 L.Ed. 1480, motion to vacate sentence denied 10 Cir., 249 F.2d 8.

8. Belt v. United States, 5 Cir., 73 F.2d 888, 889, certiorari denied 294 U.S. 713, 55 S.Ct. 513, 79 L.Ed. 1247; Steiner v. United States, 5 Cir., 134 F.2d 931, 934, certiorari denied 319 U.S. 774, 63 S.Ct. 1439, 87 L.Ed. 1721; United States v. Epstein, 2 Cir., 154 F.2d 806, 809, certiorari denied sub. nom. Epstein v. United States, 328 U.S. 858, 66 S.Ct. 1350, 90 L.Ed. 1629; Chambers v. United States, 8 Cir., 237 F. 513, 524.

counts of which he was found guilty and sentenced.

Burns called as a witness W. H. Bill Alexander, the minister of the church in which Burns was a member. The court sustained objections to certain questions relating to the attitude of Burns towards prayer and these rulings are assigned as error.

The indictment allegations relating to the scheme to defraud asserted that the defendants, without singling out any of them, called meetings of investors and that:

"  *   *   *   the defendants would and did cause said Investor meetings to be opened with a word of prayer and,  *   *   *."

Prior to the trial, Burns, together with all the other defendants, entered into a stipulation with the prosecution. Among other things, this stipulation referred to the Investor meetings and read:

"Such meetings were opened with a word of prayer,  *   *   *."

No evidence was adduced by the government that Burns either did the praying or was responsible for it.[9] Alexander, who was not called as a character witness, was asked: "Now I want you to tell this jury what you know about Mr. Burns praying." An objection was sustained. Counsel for Burns then offered to prove by the witness that Burns was "accustomed" to praying, that there was "nothing unusual or out of character about his opening a meeting of any kind with prayer," and that it was not "uncommon" for Burns to conduct prayers in church and in his home. The offer was refused.

Burns, when called as a witness in his own behalf,[10] testified that he was responsible for opening meetings with prayer and that it was "just a natural thing" for him to do. No limitation was placed upon interrogation of Burns relative to prayer. Thus, Burns thrust upon himself whatever implications there came from the use of prayer to open the meetings of the investors.

■ Counsel for Burns assert that the rejection of the Alexander testimony prevented Burns from effectively meeting the indictment allegation with reference to the use of prayer in the investor meetings. The fact of such use of prayer was admitted. Burns, by assuming responsibility for such conduct, could not make material to the case his own attitudes, habits and customs with regard to prayer. It made no difference whether he accepted and used prayer as a part of his life. So far as the meetings were concerned the query was whether they were conducted so as to present an honest and proper picture of Selected and its operations. If this was not done, the belief of the participants in the efficacy of prayer or their personal customs in regard thereto do not change the situation. The meetings were a part of the enterprise which the jury found to be fraudulent. No attempt was made to show the attitude of the other defendants on the subject of prayer. The record discloses that a number of witnesses testified as to Burns' good character. In our opinion the rejection of the offered testimony as to the attitude, habits and customs of Burns in regard to prayer was proper. In any event the state of the record is such that the rulings of the

9. Another stipulation covered testimony which would be given by an Addie C. Bentley if called as a witness and contained the statement that:  "  *   *   *  these [Investor] meetings were opened with a word of prayer." The witness Harrison, a salesman employed by Burns, testified with relation to the Investor meetings as follows:
"  *   *   *  Mimeographed instructions were sent out, I presume, to all salesmen as to how this meeting would be set up.

"Q. That came from Mr. Burns?  A. Yes, sir.
"Q. We are talking about the investors' meetings. Tell the Court and jury how the program was operated; what was the first thing. Was it suggested it be opened with a prayer, for instance. A. Yes, sir."

10. This was subsequent to the appearance of Alexander on the stand.

trial court did not prejudice Burns. He brought this aspect of the case onto himself.

 The contention is made that the court unduly restricted the examination of Burns with reference to the cashing of his certificates and his activities in regard to a satellite company. Evidence for the government established that after Burns had knowledge of the tax ruling he cashed all but $1,500 worth of the certificates which he held. Burns claimed that he cashed the certificates in order to go into the motel business. It is sufficient to say that the record shows that the trial court, with an abundance of caution, permitted Burns to testify as to his plans and activities in connection with the purchase of a motel site. It was when the line of interrogation went into minute and unimportant details that the court sustained objections to the questioning. Likewise, the curtailment of the examination relative to the satellite company was reasonable action by the court to prevent the lengthening of the trial by an exploration of collateral issues. A court has the duty to exercise control over a trial so that the evidence is confined to matters relevant to the issues.[11] The record discloses no abuse of discretion by the trial court in restricting the examination of Burns.

Finally, counsel for Burns assert errors in the instructions. The contentions are without merit. Rule 30, F.R. Crim.P., 18 U.S.C.A., requires that a party objecting to the instructions of the court to the jury state "distinctly the matter to which he objects and the grounds of his objection." We have repeatedly held that when there is failure to comply with this rule, no question concerning the instructions is preserved for review.[12] Here the objections to the instructions were as follows:

"The defendant, J. Phil Burns, objects and excepts to the giving of instructions Nos. 4, 5, 6, 6–A, 7, 8, 9, 10, 11, 12, 13, 15, 17, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 35, 38, 42, and 44."

In the circumstances there is nothing with regard to the instructions that is before us for review. However, mindful of our duty under Rule 52(b), F.R.Crim.P., to notice plain errors affecting substantial rights, we have examined the instructions. When considered as a whole they were a fair and proper exposition of the law to the jury and were in no way prejudicially erroneous.

Affirmed.

---

11. Callahan v. United States, 10 Cir., 35 F.2d 633, 634. Cf. Petersen v. United States, 10 Cir., 268 F.2d 87, 88.

12. Hayes v. United States, 10 Cir., 238 F. 2d 318, 321, certiorari denied 353 U.S.

983, 77 S.Ct. 1280, 1 L.Ed.2d 1142; Morlan v. United States, 10 Cir., 230 F.2d 30, 32.