**D. H. ROE and Stratoray Oil, Inc.,**
**Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 19713.**

United States Court of Appeals
Fifth Circuit.

April 19, 1963.

Rehearing Denied June 15, 1963.

Beale Dean, Wm. C. Pannell, Fort Worth, Tex., for appellants.

Robert S. Travis, Asst. U. S. Atty., Fort Worth, Tex., Barefoot Sanders, U. S. Atty., for appellee.

Before RIVES, JONES, and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This case is back with us again. On the first appeal, Roe v. United States, 5 Cir., 1961, 287 F.2d 435, cert. denied, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29, we reversed because the trial Court in effect directed the jury to find that the promotional transactions involving oil

and gas leases constituted the sale of "investment contracts" thereby setting in motion the requirement of an SEC registration statement if the mails are used in the sale or delivery of a security. As before, the jury on the second trial found the Defendants Roe and his corporation, Stratoray, guilty on two sets of counts charging the making of a sale [1] and the delivery [2] of a security contrary to §§ 77e (a) (1) and (2), 15 U.S.C.A. §§ 77e(a) (1) and (2).[3]

Other than specific exceptions to the Court's charge, none of which we find of any real merit, the substantial points of error now urged concern the admission of evidence. These fall in two main groups. The first, while concerned with substantially the same pieces of evidence, has two subdivisions. In brief, complaint is made of the receipt of certain exhibits because (a) these constituted evidence of a sale or delivery of securities other than those specifically charged in the several counts and (b) were in any event subsequent to the count mailings (see notes 1 and 2, supra) and hence were immaterial in establishing the crimes charged. The second group relates to evidence as to criminal prosecution, plea of guilty and conviction of Loui White and civil injunctions obtained against him by the SEC presumably for similar violations with respect to similar sales of Utah oil leases. For reasons discussed, we conclude the Court did not err in the receipt of this challenged evidence and accordingly affirm.

■ On this appeal no attack is, or could be, made on the sufficiency of the

1. As the timing is relevant in assaying errors on the receipt of evidence, the count mailings were:

| Count | Date |
|---|---|
| 15 | June 15, 1956 |
| 16 | April 12, 1956 |
| 17 | September 12, 1956 |

2.

| Count | Date |
|---|---|
| 18 | July 30, 1956 |
| 19 | November 15, 1956 |

3. 15 U.S.C.A. §§ 77e(a):
"Unless a registration statement is in effect as to a security, it shall be unlawful or any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

evidence which, for all practical purposes, is the same as on the former trial.[4] This greatly simplifies the treatment of the evidentiary errors here asserted. For our discussion is to be read in the light of the more detailed recitation of the activities there held by us to constitute the sale or delivery of "investment contracts." It sharpens analysis, however, to capsulate the problem. The thing sold or offered for sale was the entire (⅞ths) mineral lease in specific small tracts. As such, this was not the sale of a "fractional undivided interest in oil, gas, or other mineral rights," 15 U.S.C.A. § 77b. Consequently, with SEC regulation depending on the transaction constituting an investment contract, something "more than a mere offering [of] naked leasehold rights"[5] was required. The "something more" is, as the Supreme Court put it, "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party" with the test being whether the "profits [are] to come solely from the efforts of others."[6] Applying these principles as to the colorful activities of Roe and his corporate shadow, Stratoray, we had no difficulty in concluding that the promotional sales literature and activities "spelled out in terms which the gullible, young and old, could understand" that great profits "would come from sales of the leases at * * * fabulously increased prices together with overriding royalties in future production reserved in such transfers," not by reason "of the operation of these leases by the purchasers, but solely because of activities of persons other than the purchasers." 287 F.2d 435, 438. The "economic inducement" to prospective purchasers, we said, was the "chance to make a great deal of money from activities * * * carried on by persons other than the purchasers." The purchasers, we went on, "were told * * * that after they acquired these pieces of property (leases), the activity and energies and expenditures of others—the backers of the test wells—would produce earnings on the investment." And that, we concluded, "is enough." 287 F.2d 435, 439.

■■ This brief résumé is more than background. It reveals at the very outset that for there to be a crime, it took a lot more than proof of the isolated count mailings. Obviously, the statute (see note 3, supra) does not require that the entire "sale" be consummated in one single mailing. It is enough that in the execution of the sale, there has been at least one essential use of the mails.[7] This would include any "integral step in the making of the contract of sale," United States v. Greenberg, S.D.N.Y., 1962, 30 F.R.D. 164. Cf. United States v. Hughes, S.D.N.Y., 1961, 195 F.Supp. 795. And the term "sell" or "sale" is intended to be used in a broad sense. See Creswell-Keith, Inc. v. Willingham, 8 Cir., 1959, 264 F.2d 76 at 80.

■ Thus, Count 15 charged that on June 15, 1956, the "* * * defendants, did wilfully * * * make use of the mails *to sell* * * *" an investment contract "the * * * mails being" used on that date when the "defendants * * * wilfully * * * caused to be placed in an authorized depository * * a letter addressed" to a named purchaser. The phrase "to sell" means at least "in order to sell," that is, in order to consum-

4. Of course the precise evidentiary problems were not there presented. The scope of the issues and hence relevant evidence was much broader in view of the 14 counts charging fraud and the conspiracy count as to which there was an acquittal. In the second trial, the Court, in its charge, made clear that fraud was not an element in this case.

5. 287 F.2d 435, 437.

6. SEC v. W. J. Howey Co., 1946, 328 U.S. 293, 298–299, 301, 66 S.Ct. 1100, 1102–1103, 90 L.Ed. 1244. See at 287 F.2d 435, 438.

7. We refer to "mails" as that is the facility involved here. The statute, of course, covers all other interstate means of transportation and communication. See note 3, supra.

mate a sale. We may assume (without deciding) that where the charge is for making a "sale" or for using mails to "sell" as distinguished from a charge of an unlawful "offer to sell" the Government must prove that as to that transaction there was ultimately a completed sale. But we reject the contention of defendants based on the 1954 amendments [8] that the term "to sell" as here charged must mean a completed transaction as of the time of the receipt of the count mailing by the purchaser.

██ Without specifically discussing each challenged exhibit (or related testimony), we think it is sufficient to state that evidence before and after the count mailing date *may* be admissible. It will be admissible if relevant to the broad question of "investment contract." This, as we earlier pointed out, is essentially the problem of proving the "something more" than the mere sale of a mineral lease. That will include all of the material transmitted to the particular purchaser named in the charge in which the jury could say the "economic inducement" is expressed or implied. The cut-off time would ordinarily run as late as the last piece of material bringing about the completed purchase. And even that time limitation must be flexible and hence pretty generally left to the wise discretion of the trial Judge. Thus, as an example, circumstances might be such that a jury could conclude that in a high pressure sales campaign, the promoters

thought it wise to allay apprehension of those who had purchased by a continuation of reassuring literature. Likewise, such material would be admissible in showing any one or more or all of the uses of the mails in the course of bringing about the sale as ultimately consummated.

██ In addition to the use of such material in establishing the "investment contract" and the purposeful use of the mails in the consummation of the specified sale, the evidence was admissible here for other reasons. All was put in issue by the plea of not guilty. That meant that in addition to the elements already discussed, the Government had to establish (a) the identity of the defendants as the actors, and (b) that their actions were wilfully and knowingly done in order to effectuate the sale. When it comes to the requisite quality of "wilfulness," [9] it is apparent that considerable latitude must be accorded in the receipt of evidence under the considerate discretion of the trial Judge. For when intent, as distinguished from knowledge, is being established, it matters not whether the acts are prior or subsequent to the time of the crime charged. "Intent is a state of mind difficult of precise proof and, therefore, evidence of other and surrounding circumstances may be received for the purpose of proving such intent. Acts done and declarations made after the act of which the defendant is accused are admissible as bearing on intent."

**8.** As amended in 1954, § 77b provides:
"When used in this subchapter, unless the context otherwise requires— * * *
"(3) The term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value. The term 'offer to sell', 'offer for sale', or 'offer' shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value. * * * *"
Prior to 1954, the term "sale" or "sell" was defined to include offers. See 1 Loss, Securities Regulations 186–222 (1961). The amendments enabled distribution of the "Red Herring" prospectus between the filing of an SEC registration statement and its effective date. See Columbia General Inv. Corp. v. SEC, 5 Cir.,

1959, 265 F.2d 559, 563; Peoples Securities Co. v. SEC, 5 Cir., 1961, 289 F. 2d 268, 273.

**9.** In the posture of this appeal, we avoid again, as we earlier did, 287 F.2d 435, 441, the necessity of determining the meaning of the term "willfully." But in assaying relevance and admissibility it is significant that the Judge adopted the defendants' interpretation of the term. The case was tried on the Judge's early declaration (and later charge) that "The word 'knowingly' means done with knowledge, consciously and intelligently. The word 'willfully' means done deliberately and intentionally, with knowledge at the time that the conduct is an unlawful act."

Shreve v. United States, 9 Cir., 1939, 103 F.2d 796, 803, cert. denied, 308 U.S. 570, 60 S.Ct. 84, 84 L.Ed. 479.[10]

■ As a part of this claim of error, defendants assert additional contentions. They argue that receipt of evidence not tied directly to the count mailing allows the jury to consider transactions which involve the proposed sale of securities other than the ones specified in the charge. Presumably that results because the sales literature, representations, etc. invite purchases generally and not merely the particular one finally consummated. Likewise, they continue, it exposes the jury to the contaminating influence of much inflammatory, but otherwise irrelevant, material not directly related to the specified sale. As examples of this, they point to the boastful extravagant claims of Roe's expertise, fabulous, but genuine, oil wells in earlier fields, and the like. To eliminate the latter, they insist that the trial Court, as a minimum, should have edited out such portions by suitable deletions.

We regard these criticisms as unfounded. In the final analysis they add up to the proposition that the Court is to try the defendants, not upon the basis of their own promotional sales material, but rather upon a reconstruction of them with such excisions, deletions and verbal surgical treatment as the trial Judge might think necessary to keep the resulting product from conveying an inflammatory or adverse impression. But as Mr. Justice Jackson observed in the celebrated Joiner case, "In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be." [11] So long as they are within the time-range bearing on the sale of the

specified "investment contract" or pertinent as relevant proof on the other elements of the crime, it is not for the defendants to complain that the material would also establish the sale or offer of other securities, or that its tone was such that it hurt.[12] This also disposes of the contention that the Court should have instructed the jury that as to each count it could consider only evidence *prior* to the particular count mailing.

■ Viewed in the light of these general guides as to admissibility, only as to a very few of the challenged exhibits and related testimony was it doubtful. And as to those, there is absolutely no basis for concluding that the error, if it was an error, was harmful. F.R.Crim.P. 52. Ahlstadt v. United States, 5 Cir., 1963, 315 F.2d 62. Thus, for example, under counts 15 and 17 with Crowshaw as the purchaser, five out of the six post-count mailing sales letters are identical to those clearly admissible as to another person and count. The same is true as to eight sales letters under count 19. Likewise, checks sent by purchasers at dates subsequent to various count mailings were, at most, cumulative of others showing success of the sales campaign which, as a whole, had generated receipts in the thousands of dollars as the jury well knew from other admissible proof.

■ The other evidentary problem is more serious. The error urged is the admission of testimony from two witnesses and in the cross examination of the defendant Roe that Loui White had "troubles" with the SEC, was enjoined in a suit by it and was convicted on a plea of guilty to an indictment for violation of the Federal Securities Act in the sale of Utah mineral leases. By it the jury was informed expressly that another—

---

10. See also Benchwick v. United States, 9 Cir., 1961, 297 F.2d 330; United States v. Prince, 3 Cir., 1959, 264 F.2d 850; Waller v. United States, 9 Cir., 1949, 177 F.2d 171; United States v. Laurelli, 3 Cir., 1961, 293 F.2d 830.

11. SEC v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 352–353, 64 S.Ct. 120, 124, 88 L.Ed. 88.

12. The Court made clear in its charge that fraud was not an element in the case. But the Court was not required to go further and give the requested instruction that the transactions were not fraudulent.

White—had been convicted of a crime. This is what makes the problem more serious. For the law must protect against the human tendency to conclude that birds, like words, are frequently judged by the company they keep— *noscitur ex socio*. But despite the adverse implications—often spectacular and occasionally inflammatory—from proof showing commission of some crime other than the one being tried, the law does not accord an automatic immunity from such evidence. Care must, of course, be taken to keep such evidence in proper bounds. If it has no connection with any elements of the offense being tried, it may not be introduced merely to cast the defendant in a bad light.[13] In the words of Judge Hutcheson, it may not be used merely to "give a dog an ill name and hang him." Olinger v. Commissioner, 5 Cir., 1956, 234 F.2d 823, 824; Goldberg v. Commissioner, 5 Cir., 1956, 239 F.2d 316, 321. But it is essentially a question of relevance. And it is now clear that evidence that is relevant to prove one crime does not become inadmissible because it also proved another.[14]

When it comes to the matter of relevance, there can be no doubt as to this evidence in the setting of this case. Loui White was no stranger to the enterprise. With Roe he too was a major stockholder and moving figure in Gamaray [Gamma Radiation Surveys, Inc.]. Roe's first contact with Utah likely was his trip to Utah representing Loui White and Penn. White had some interest in the Jess Hickey well, a well drilled in Utah prior to the activities of Roe. And White had entered into negotiations with Roe and Penn and others on the Utah well. Stratoray purchased considerable blocks of Utah mineral leases from him for which many thousands of dollars were paid. It was out of these lease blocks that the small tract leases came for sale by Stratoray to investors across the country under the high pressure promotional scheme. Moreover the jury could infer that much of this very cash received by White was in turn put into the Texas test well to which Stratoray (or Roe) in effect contributed acreage under an option arrangement.

One of the crucial issues in the case against Roe (and Stratoray) was whether the defendants "willfully" (see note 9, supra) used the mails in making sales or delivery of "investment contracts" without a prior SEC registration. As we pointed out in the very beginning of this opinion, this put an unusual burden on the Government to show that there was "something more" than mere sale of mineral leases. And, on the theory of willfulness adopted by the Court at the insistence of the defendants, the Government also had the burden of establishing that the defendants were aware that it was this "something more" which made these particular transactions investment contracts. In that process probably the best proof of such "willfulness" would be a prior conviction of the very same defendant for acts substantially identical. But equally relevant and persuasive would be the acts of others with whom the present defendant has close connections and which, to his knowledge, resulted in a conviction (or other significant judicial actions such as an injunction) of the other. This requires, of course, that it be tied in sufficiently both in point of time and similarity.

The element of time presents no real problem. Since this is a question of intent, acts done before and after the crime charged are admissible if the circumstances show a sufficient connection from which inferences may reasonably be drawn. (See note 10, supra). Here

---

13. See Nigro v. United States, 8 Cir., 1941, 117 F.2d 624; Scott v. United States, 5 Cir., 1959, 263 F.2d 398.

14. See United States v. Krulewitch, 2 Cir., 1944, 145 F.2d 76, 156 A.L.R. 337; Weiss v. United States, 5 Cir., 1941, 122 F. 2d 675; Morrison v. United States, 4 Cir., 1959, 270 F.2d 1, cert. denied, 1959, 361 U.S. 894, 80 S.Ct. 196, 4 L. Ed.2d 150; McCormick, Evidence § 157 (1954); 2 Wigmore, Evidence §§ 300, 302, 305 (1940).

the evidence, both from Roe himself, as well as from others, permitted the jury to infer that Roe's conduct after he became aware of White's legal involvements was the same as before. Once he knew of the White indictment and conviction under it, the jury was certainly entitled to infer that Roe knew that such sales violated the law. And since his conduct after knowledge was the same as it was before these events occurred, the jury was equally warranted in considering this as some evidence showing the purposeful doing of acts which he knew were in violation of law. Especially was this true since testimony from one witness fixed the event of the Fort Worth Grand Jury's investigation of White and Roe's knowledge of it in June 1956, whereas in his testimony, Roe put it in September. The earlier date, if credited, was prior to the mailing date of at least one of the sales counts and prior to both mailing dates in the delivery counts (see notes 1 and 2, supra). An added factor, of course, is the close connection of Loui White to this very enterprise involving Utah leases.

Nor do we think the element of similarity is lacking, or if deficient, that the defendants are in a position to challenge it. It is ironic that in this phase of the objection, the defendants in effect urge that the evidence was not complete enough, did not reveal sufficient of the details of White's activities, to enable the jury to conclude that his indictment, conviction and civil injunction either taught Roe anything or that he persisted in conduct with knowledge thus gained that it violated the law. Their complaint is, therefore, not that too much, but that too little of the White incident was offered.

Roe's own cross examination showed that it was common knowledge, so he said, that the SEC had obtained an injunction against White because of the sale of Utah leases. Though not precisely fixed, the jury could conclude it was issued prior to June 1956. White's legal problems were discussed by Roe and Penn. That included the fact that the SEC was "interested in Mr. White's activities" and that the SEC had obtained "an injunction enjoining Mr. White from selling leases in Davis, Salt Lake and Tooele Counties, Utah." He was also aware of the Grand Jury investigation, the indictment, and the Fort Worth trial at which a judgment of conviction was entered in September 1956. This was brought closer home to Roe's own activities. In his testimony he acknowledged that he "knew Mr. White was convicted for violation of the Federal Securities Act" which was the "same act that [he was] charged with here" on this trial, and that it was in "connection with this sale of leases in Salt Lake, Davis and Tooele Counties, Utah."

Up to this point a persuasive argument could be made that while this evidence indicated strongly that White's activities had been substantially the same as Roe's the damaging nature of proof of the commission of another crime—especially by a different person—is such that to permit the offer of even a part of it, the Government, as an integral part of its offer, would have to be prepared to offer all of the details showing similarity.

Likewise, under the broad umbrella of the not guilty plea, an argument could be marshaled that perhaps White's violations of federal securities laws were the consequence of quite different actions, the only similarity being the geographical location of the leases and his some-time connection with Roe or Penn. But events demonstrated that the defendants did not want those details, that whether complete or incomplete, they did not want the White episode evidence in the case at all. When Government counsel pressed Roe concerning his knowledge of law regulating the sale of securities and whether White's conviction caused Roe to become suspicious about his activities, defense counsel again objected strenuously to this proof "of guilt by association." Elaborating on this objection, defense counsel urged "there is not even any showing before the court what the charges against Loui White were, or whether they involved these same transactions."

To this Government counsel immediately responded that he had "the indictment and conviction in that case" to be "offered in evidence." But to this and the Government's further assertion that such proof was "pertinent to this [Roe's] indictment, surely it is admissible on this man's [Roe's] state of mind," the Court ruled "I think not. I will sustain the objection."

 Thus it is now crystal clear that when the Government sought to correct whatever deficiency there was from a lack of details showing similarity between White's activities for which he was indicted and convicted and those for which Roe was charged, the defendants objected. More than that, the Court, responding to that objection, sustained it. The defendants can hardly urge here that the trial Court erred in making the very ruling which the defendants in vigorous terms urged it to make.[15] And this is in no sense an instance in which valuable legal rights are lost from an inadvertent error, either of omission or commission, on the part of defense counsel. Whether for strategic or tactical reasons one can readily understand why these vigorous, competent counsel felt it unwise to add to the sales literature distributed by Roe any details concerning the materials or methods used by White. Of course on this record no one knows what those details were. But an advocate's conscientious choice was articulately made. Absence of further connecting details may not be charged either to the prosecution or the Court.

The evidence was relevant and persuasive. If it was deficient because lacking in detail showing similarity, this was due to the Court's ruling in response to the defendant's objection. If this was an error, it was one of which the defendants cannot here complain.

So far as objections to the Court's charge or for refusal to give requested charges is concerned, we find none to be

of any substantial merit. The Court gave a full and fair charge covering both the substantive principles on the elements of the crimes charged and the function of the jury in resolving conflicts in the evidence.

Affirmed.

JONES, Circuit Judge, concurs in the result.

---

15. See Edwards v. United States, 6 Cir., 1959, 265 F.2d 909; Hagans v. United States, 5 Cir., 1959, 261 F.2d 924; Holdsworth v. United States, 1 Cir., 1950, 179 F.2d 933; Smith v. United States, 9 Cir., 1949, 173 F.2d 181.