**Reed R. MAXFIELD and John R. Christopher, Appellants,**

v.

**UNITED STATES of America, Appellee.**

Nos. 8208, 8209.

United States Court of Appeals
Tenth Circuit.

April 22, 1966.

98

---

Ronald C. Barker, Salt Lake City, Utah, for appellant John R. Christopher, Clifford L. Ashton, Salt Lake City, Utah, for appellant Reed R. Maxfield (Robert W. Hughes, Salt Lake City, Utah, with them on briefs).

David K. Winder, Salt Lake City, Utah (William T. Thurman, U. S. Atty., Salt Lake City, Utah, David B. Bliss, Washington, D. C., and Seymour Glanzer, with him on brief), for appellee.

Before MURRAH, Chief Judge, and BREITENSTEIN and SETH, Circuit Judges.

MURRAH, Chief Judge.

Appellants Maxfield and Christopher separately appeal from a judgment and sentence pursuant to a jury verdict on eight inexcusably prolex and redundant counts of an indictment, each of which charges separate violations of the anti-fraud provisions of the Securities Act of 1933, 15 U.S.C. 77q.[1] In identical language (except the specific charge of separate fraudulent sales to different individuals) they charge the defendants with having devised an unlawful scheme to sell the stock of Uinta National Life Insurance Company by means of untrue statements and omissions to state material facts. Each count charges the same sixteen specific misrepresentations and nineteen concealments of material facts.

[1] Counts 9 and 10 of the indictment charged each of the defendants with a scheme, device or artifice to defraud by use of the mails in violation of 18 U.S.C. § 1341. Count 11 charged that appellants conspired to violate the Securities Act and the Mail Fraud Statute in violation of 18 U.S.C. § 371. Both defendants were acquitted on Counts 9, 10 and 11.

In his instructions to the jury Judge Christensen epitomized the charges to the effect that during the period referred to in the indictment, Maxfield served as President, Chairman of the Board and controlling person of both Uinta Finance Company and Uinta National Life Insurance Company and he also organized, dominated and controlled Western States Underwriters and Mid-America Securities of Utah; that during the same period referred to in the indictment, Christopher served as Sales Manager and salesman and, together with Maxfield, dominated and controlled the business affairs of Uinta National, Mid-America and Western States; that upon the organization of Uinta National in May, 1958, Maxfield personally acquired, either directly or through others under his control, 10,000 shares of the 76,250 authorized shares of Uinta National at a cost of $14.775 per share in consideration of promotional services; that he and Christopher offered, sold or caused to be offered and sold to investors through the services of Uinta Finance and Western States all of the 10,000 shares at prices ranging from $40 to $70 per share.

With characteristic thoroughness and fairness, the trial court guided the jury through the complexity of the allegations in the indictment, explaining the meaning of both the applicable law and the charging language. The court interpreted the essential and basic elements of the Government's allegations as the offer and sale of the Uinta National Life Insurance Company stock through the Western States Underwriters by misrepresenting the identity of the parties beneficially interested in said stock, particularly Maxfield's interest therein, or concealing such interest; by representing the non-availability of the stock to the general public and its preferential availability to stockholders by means of preferment or entitlement certificates; by misrepresenting the increasing value of the stock and its deliverability when paid for by the particular investor.

■ At the conclusion of the instructions, counsel for Christopher excepted only to the court's failure to give all requested instructions not given and to all instructions given as requested or suggested by the Government. We have said that this form of generalized objection is insufficient to distinct'y state the matter objected to and the grounds for the objection as required by Rule 30, F.R. Crim.P., 18 U.S.C. See Burns v. United States, 10 Cir., 286 F.2d 152. Counsel for Maxfield's only exception was that "inasmuch as the complaint charged that Maxfield was a controlling person in Western States, the court should have instructed the jury that it must so find."

■ Apparently without contending against the sufficiency of the evidence to go to the jury on the existence of a fraudulent scheme, Maxfield insists that the evidence is entirely insufficient as a matter of law to sustain the allegations in the indictment to the effect that he dominated and controlled the Western States Underwriters or that he had anything whatsoever to do with the sale of Uinta National stock as alleged in the indictment. Instead he points to his strenuous objection to Christopher's operation of Western States and to his protest to the Utah Securities Commissioner. In sum he contends that although he sold no stock, employed no salesmen, supplied no information to the public, and received no money from the sale of stock, he was nevertheless found guilty of all the misdeeds charged to Christopher, with whom he had been found not to have conspired. He says that acquittal on the mail fraud and conspiracy charges required acquittal on the other eight counts. But, as we have recently held following established authority, since each count in an indictment is a separate offense, consistency in the verdict is not necessary. See Burns v. United States, supra; Thomas v. United States, 9 Cir., 227 F.2d 667.

The basic facts are that Maxfield, his brother and others organized and promoted Uinta Finance by a public offering of its stock within the state of Utah.

Maxfield was President, Chairman of the Board and dominant officer. Christopher was Sales Manager during part of the stock offering. In May, 1958, Maxfield and at least some of the incorporators of Uinta Finance formed Uinta National Life Insurance Company with a $10,000 paid-in capital structure. The incorporators apparently gave notes for their respective stock subscriptions, and Maxfield thereafter acquired the 9,600 shares of non-voting incorporators' stock. About five months later, he borrowed $125,000 from Uinta Finance to pay for the stock and qualify the insurance company in Utah as a legal reserve company. The insurance company public stock offering was completed in the latter part of 1958. The last block of stock was sold to a former stock salesman for Uinta Finance and Uinta National who in turn sold it to Mid-America Securities.

Early in 1959 Maxfield divided 6,050 shares of his incorporators' stock into 242,000 units and sold it to Uinta Finance for $242,000. His loan account with the insurance company was credited with this amount. It thus appears that the incorporators' stock which Maxfield purchased for the sum of $125,000 was resold to the finance company for $242,000.

■ Mid-America had been organized by appellant Maxfield's brother in 1955 and apparently thereafter sold to Norman Hays. In 1958 Maxfield negotiated the resale of the company to his brother for the sum of $2,500, paid by a Uinta Finance Company check. Christopher registered as a dealer for Mid-America and apparently became its Sales Manager. Early in 1959 Maxfield negotiated the resale of the company to Hays for $1,500 and arranged with Hays for Mid-America to sell some of the stock which he had sold to Uinta Finance by depositing the stock in a safety deposit box for delivery as and when sold. But, on advice of counsel Hays finally declined to participate in the sale of the stock. Maxfield objected to the competency of these transactions, but the evidence was apparently admitted to show Maxfield's continued interest in the sale of his insurance stock to the public and also as a nexus with the Western States activities. We think it was admissible for that purpose. See Roe v. United States, 5 Cir., 316 F.2d 617.

In the Fall of 1958 Christopher had resigned as Sales Manager for Uinta National and early in 1959 with his wife and others he organized Western States Underwriters. It immediately entered into a contract with Uinta Finance for the sale of Uinta National stock which Maxfield had sold to the finance company. Thus, Christopher was Sales Manager for Uinta Finance when its stock was being offered directly to the public by the company. He was Sales Manager for Uinta National when its stock was being sold directly to the public. After the offering was completed, he became a registered salesman and Sales Manager for Mid-America. He then became Sales Manager for Western States. In all of these stock offerings some of the same salesmen were used with the same sales kits which had been prepared by a sales promotion organization at the instance of Maxfield. Under an agreement with Uinta Finance, the insurance stock certificates were placed in a safety deposit box and were to be delivered to Western States as and when the stock was paid. Purchasers of the stock were permitted to pay for it either at the office of the finance company or Western States and to make their installment payments alternatively for stock purchased directly from the insurance company or through Western States.

■ There can be little doubt of the sufficiency of the evidence to go to the jury on the fraudulent scheme to sell Uinta National stock through the facilities of Western States Underwriters. There was no disclosure of the circumstances surrounding Maxfield's acquisition of the stock and its sale to the finance company, and that the offering was a secondary issue. There was no demand for the stock justifying preferential representations to the stockholders.

This sales gimmick was certainly susceptible of an inference of fraudulent misrepresentation in order to induce stockholders to buy more stock under the impression that the stock was in a seller's market. Then too, there was proof to the effect that Western States did not deliver the stock upon payment. Of a total of $182,000 received by Western States for stock sales during the charging period only $96,140 of fully paid up stock was ever issued to investors. $28,566 worth of stock was partially paid for by installments but not delivered, and $54,810 worth of stock was fully paid but not delivered.

The jury was instructed that " * * * failure to deliver stock or the failure to refund money * * * is not in and of itself charged as a criminal offense against either defendant, and such mere failure would not authorize a conviction in this case. On the other hand, if there were * * * a plan to defraud, participated in knowingly and agreed to by one or more of the defendants and the use of the mails pursuant to such plan * * * then the fact that thereafter money or stock either was not refunded or the fact that the buyers either did or did not sustain loss * * * would be no defense to the * * * defendants so participating in * * * such scheme to defraud."

There was also evidence that during the time that Western States was in default on stocks sold and undelivered, Christopher and his wife drew over $30,-000 from the company. The jury was specifically told that Christopher was not charged with the offense of withdrawing money from Western States or failure to deliver stock or refund money to persons who purchased stock from it, but these circumstances could be considered in determining his intent to devise a scheme to defraud as alleged in the indictment. There was evidence of fraudulent representations by salesmen concerning the value of the stock and the condition of the company, certainly enough to go to the jury on the issue of fraud and Christopher's complicity in it.

There was proof that Uinta National's Comptroller examined the Western States books and found a deficiency of about $15,000, and that it was reported to Maxfield; that Maxfield knew of Western States' deficiencies and defaults but took no action to protect the investors or prospective investors. Maxfield's persuasive answer is that in the first place he had nothing whatsoever to do with Western States' sales activities, was not interested in it and owed it no obligation. In the second place he says that when he finally learned of the financial situation, he complained to the Utah Insurance Commissioner and the Securities Commission; that his affirmative steps to protect the finance company and the insurance company from the stigma of Western States' defalcations should serve to exonerate him from any complicity in the enterprise. He says with emphasis that there was certainly no evidence to support the allegations in the indictment to the effect that he dominated and controlled Western States and that the jury should have been directed to return a verdict for him.

The trial court specifically instructed the jury concerning the evidence relative to Maxfield's acquisition of the Uinta National stock sold through the facilities of Western States. The jury was told that the Government did not claim the acquisition of such stock by Maxfield in and of itself constituted criminal fraud and that the facts and circumstances surrounding the transaction and the sale of the stock to the finance company could be considered only with other facts and circumstances to determine whether in order to dispose of the stock Maxfield, himself or jointly with Christopher, devised a plan or scheme to sell such stock through Western States by means of false representations and caused the mails to be used in furtherance of such scheme.

With respect to Maxfield's alleged control of Western States the jury was specifically told that while it was not necessary for the government to show that in all respects and at all times Maxfield

was and continued in control of Western States, it was essential to show beyond a reasonable doubt that Maxfield devised or agreed to a plan or scheme to utilize Western States to effectuate a fraudulent plan to dispose of the stock to the public and in furtherance of this plan Christopher or someone else acting in his behalf and within the scope of the plan utilized the United States mails as charged.

■ The jury was told that if Maxfield did not become a party to a plan or scheme to dispose of stock by false representations through Western States, any false representations used without his authorization by Christopher or those acting under him could not be attributable to Maxfield. On the other hand, if it is shown beyond a reasonable doubt that Maxfield was a party to the alleged plan or scheme to dispose of the stock to the public by means of some or all of the material false representations charged, then the defendant could be held responsible for such false representations, if any, even though he had no actual knowledge of them at the time they were made.

■ Our examination of the record does not disclose that either of the appellants moved for a judgment of acquittal at the close of all of the evidence. In this posture of the case the sufficiency of the evidence to support the verdict of the jury is not open to us unless we are convinced from an appraisal of all of the evidence that the verdict is palpably wrong. See Fitts v. United States, 10 Cir., 328 F.2d 844; Hughes v. United States, 10 Cir., 320 F.2d 459. In any event we think the proof and the permissible inferences to be drawn from it was sufficient to go to the jury on the question of Maxfield's participation in the fraudulent scheme to sell Uinta National stock through Western States.

■ Maxfield also took exception to the cross-examination of him concerning his activities in connection with the merger of the insurance company with another company and the amount of money he made from the transaction. But, the record shows that the door was opened on direct examination, and the scope of the cross-examination was for the trial court. There is nothing to indicate that the court's allowable discretion was abused. See Wilcoxon v. United States, 10 Cir., 231 F.2d 384.

■ Christopher separately complains of the admission of his deposition taken by the S.E.C. and read to the jury over his objections. It was admitted as an incriminating statement against him, and the jury was cautioned that it was admissible as against him alone and not against Maxfield. It was voluntarily given while he was represented by counsel, and it is not rendered inadmissible simply because he thought it would serve to exonerate him of blame in the venture.

■ He also complains of answers by the court to a question of a juror. At the conclusion of all the evidence and instructions of the court, one juror inquired, "What do we do in case we don't agree unanimously? Do we continue to ballot?" The court answered, "Certainly, I see no likelihood or possibility at this stage of your not agreeing. It would be unusual if you don't agree. I've already instructed you with regard to the unanimity of your verdict. It would be most unfortunate if any juror at this time has made up his mind or had it in mind that they weren't going to agree, and I hope that that question doesn't reflect any such state of mind. But, nonetheless, I have given you an instruction on that." In the first place, no exceptions were taken to the court's answer, and in the second place, it was perfectly proper.

Prejudicial error is also claimed in the court's instructions relating to subparagraph 12 of the specifications of false representations. The indictment alleged in subparagraph 12 that Western States had represented to prospective investors that the law of Utah "compels insurance companies to invest every dollar of its assets in United States bonds or securities which the State considers just and

safe." The court did read this representation to the jury along with eleven other specifications and a number of specific acts of fraudulent concealment. In calling attention to these specific representations or fraudulent concealments, the court told the jury that there were other allegations of false representations and fraudulent concealment which it was perfectly free to consider, but pointed to the enumerated ones as, in its view, most material to the essential elements of the offense.

Christopher contends simply that a representation of the law of the State of Utah, or a statement of an opinion concerning it could not form the basis for a false representation. In the first place, no objection was taken to the court's instructions concerning this specific misrepresentation and concealment. If the representation was incapable of being fraudulent, counsel should have objected to it as such, either as being improperly alleged or improperly submitted to the jury. In the second place, the representation was not singled out for emphasis, except in connection with the eleven other specific misrepresentations which the court deemed material. Conceding that an opinion on the law cannot be the basis for fraudulent misrepresentation, when considered in the context in which reference was made to it, we do not think it was palpably erroneous and it cannot, therefore, be noticed here for the first time on appeal.

Finally, both Christopher and Maxfield complain of the failure of the court to discharge the jury because of the illness of the wife of one of the jurors. The record in that respect, however, shows that the court proceeded with the full knowledge and consent of all the parties. No objections were made at any point. It appears that while the jury was deliberating, information came to the court that the juror's wife was to have surgery. After discussing the matter in chambers, and after having agreed upon a course of action, but before the court had time to inform the juror as agreed, the jury arrived at its verdict.

There can be no complaint. No objections were ever made—as a matter of fact, no objections could have been made of the trial court's agreed treatment of the problem. Cf. Bacino v. United States, 10 Cir., 316 F.2d 11.

The judgment is affirmed.